**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jerry Lane WOOTEN, Shawn**
**Catherine Sloan, Defen-**
**dants–Appellants.**

No. 00–1622, 00–1918.

United States Court of Appeals,
Sixth Circuit.

April 12, 2002.

84

Before KENNEDY, BOGGS and
DAUGHTREY, Circuit Judges.

KENNEDY, Circuit Judge.

Defendants Jerry "Beck" Wooten and
Shawn Sloan appeal their convictions and
sentences on various charges arising from
their operation of a business buying and
selling stolen air bags across state lines
and laundering the proceeds. Both defen-

dants were convicted by a jury of conspiring to transport stolen goods across state lines and conspiring to launder money, of interstate transportation of stolen goods, of structuring financial transactions, and of money laundering. The district court sentenced Wooten to 188 months in prison and Sloan to 135 months. On appeal, the defendants raise numerous issues.

Wooten assigns error to the district court's refusal to issue a special warning to the jury that it should not discuss the case prior to the deliberation phase of the trial after the judge received several questions by jurors, to the court's estimate of the amount of money laundered by the defendants, and to the court's admission of testimony indicating that the defendants did not report robberies at their business to the police. Sloan claims on appeal that the district court erred in failing to grant the defense's motion for judgment of acquittal under Fed. R.Crim. Pro. 29. Sloan also argues that the district court found it could not grant her a downward departure and thereby committed reversible error, and asserts that judge erred in enhancing her sentence for the amount of money involved and her role in the criminal enterprise. Finally, Sloan argues that *Apprendi* required a jury finding as to the aggravating circumstances that led to the 10 year mandatory minimum.

## I. BACKGROUND

The following facts are drawn from the evidence and testimony introduced at trial. Because Sloan's appeal in part challenges the sufficiency of the prosecution's evidence, we recount the facts in the light most favorable to the prosecution. *United States v. DeZarn,* 157 F.3d 1042, 1046 (6th Cir.1998).

The defendant Sloan was the licence holder for Beck's Wheels, a business located in Detroit, Michigan. Along with defendant Wooten, she ran the business. Wooten and Sloan lived together at the time, and are now married. Sloan hired Edmond Krolikowski around 1995 to operate the business, and Krowlikowski took orders from both defendants. Each day, someone would cash a check from the Beck's Wheels accounts for $9,000 and bring that money to Beck's Wheels. Shawn Sloan's father, her mother, and her brother-in-law were among the people who cashed checks from the account.

Krolikowski would use the $9,000 cash to buy air bags, radios, and tires from people who lined up outside of Beck's wheels. By nine in the morning, when the shop opened, nine or ten people would be lined up outside of the store. Beck's Wheels would allow people into the shop one at a time. The individuals would pass the goods through a bulletproof glass window and be paid in cash according to a price list posted on the wall of the business office. The listed price for air bags was $70. Occasionally, Wooten would request that some of his "suppliers" steal particular kinds of air bags, for which he would pay a premium. Beck's Wheels sold the air bags to two main customers, Bass Enterprises in Rialto, California (run by Donald Garrett and Michael Perona), and Benny Hunt in Alabama. Beck's would receive $125 to $150 per air bag, or up to $200 for air bags from luxury cars. At authorized dealerships air bags are $400 and up.

In 1997, a working group composed of law enforcement officers from Troy and Detroit Michigan and the Federal Bureau of Investigation began to investigate the high rate of air bag and automobile theft in the Detroit area. During a traffic stop of a van driven by co-defendant Donald Garrett, the Michigan State Policy seized 364 air bags that had been purchased from defendant Wooten at his place of business,

Beck's Wheels. The officers were able to positively establish that 192 of the air bags—the only ones that they could trace—were stolen.

The FBI engaged in surveillance at Beck's Wheels starting in the summer of 1997. At one point, Shawn Sloan and her sister-in-law drove up next to the car in which FBI Special Agents were sitting and photographed the agents. Police officers were also part of the surveillance effort. Law enforcement officers used a time lapse camera posted outside of the store, and recorded telephone conversations from the telephone at Beck's Wheels. In January, 1998, Detroit Police Department Lieutenant Robert Ennis performed an administrative inspection (pursuant to the licencing law for automotive repair and supply firms) at Beck's Wheel's and seized a large number of stolen air bags. On February 10, 1998, officers executed search warrants at Beck's Wheels and at the residence Sloan and Wooten shared. Among the items found in the home of Sloan and Wooten was a laptop computer belonging to Thaddeus Jones. Jones's laptop had been removed from his car along with the vehicle's air bags and radio after the car was stolen.

Sloan and Wooten, along with 13 other defendants, were indicted by a grant jury on June 16, 1998. A month after the indictment, the defendants Wooten and Sloan were married. After a trial involving Wooten, Sloan, and two other defendants, Sloan's attorney moved for a judgment of acquittal under Rule 29. The judge reserved ruling on the motion until after the jury deliberated. The jury convicted Sloan and Wooten of: conspiracy to transport stolen goods across state lines and to launder money, 18 U.S.C. § 371, 1956(a)(1)(A)(i) & 2314; interstate transport of stolen goods and aiding and abetting, 18 U.S.C. §§ 2 & 2314; structuring financial transactions, 31 U.S.C. § 5324(3); and money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). Counsel then filed a written motion for judgment of acquittal, which the district court denied.

Prior to sentencing, Sloan's counsel filed a motion for a downward departure, which was denied, and the defendants were sentenced. The district court imposed upon both defendants a four-level sentencing enhancement for playing the role of a "leader[ ] or organizer[ ] of the conspiracy," U.S.S.G. § 3B1.1(a), and a six-level enhancement because over two million dollars was laundered through the bank accounts of Beck's Wheels, U.S.S.G. § 2S1.1b(2)(G).

## II. SLOAN'S ARGUMENTS ON APPEAL

### A. Denial of Motion for Judgment of Acquittal

■ Sloan's first argument on appeal is that the district court erred in failing to grant her post-verdict motion for a judgment of a acquittal. We review motions for judgment of acquittal under a *de novo* standard, *see United States v. Adamo*, 742 F.2d 927, 932 (6th Cir.1984). A court will not grant a Rule 29 motion if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A defendant so challenging the sufficiency of the evidence bears a very heavy burden. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986).

At trial, Sloan's attorney moved for judgment under Rule 29 on the grounds that there was no evidence that Sloan knew the air bags were stolen. The district court rejected that motion, and the

defendant renews her claim in this appeal. Sloan's argument here, as in the court below, is that in spite of the fact that the business was in her name, that the accounts from which the money used to purchase stolen air bags was drawn were in her name, and that she hired employees such as Krowlikowski, a reasonable jury could not have found—beyond a reasonable doubt—that she knew that the air bags were not legitimately purchased for resale. Therefore, she argues that a reasonable jury could not have convicted on the conspiracy and interstate transportation of stolen goods counts or of money laundering, which requires knowledge that "the property involved in a financial transaction represents the proceeds of some form of unlawful activity ...." 18 U.S.C. § 1956(a)(A)(i).

It is true that the government offered no direct proof of Sloan's knowledge that the goods were stolen. However, there was strong circumstantial evidence that she had such knowledge. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361 (6th Cir.1984). In defending a Rule 29 Motion, the government should be given the benefit of all reasonable inferences drawn from the evidence, even if the evidence is circumstantial. *Adamo*, 742 F.2d at 932.

Circumstantial evidence of her knowledge of the criminal nature of Beck's Wheels abounds. Sloan had a leadership role in the organization, with primary responsibility for its finances, and hired key members of the conspiracy. Her family members were recruited to be part of the conspiracy. She lived with—and shared a personal relationship with—the unquestioned leader of the conspiracy. She behaved suspiciously toward federal agents conducting surveillance. A stolen laptop (not the sort of thing that parts stores usually purchase from their suppliers) was found in her home.

In *United States v. Warshawsky*, 20 F.3d 204, 210 (6th Cir.1994), this court upheld a conviction over the defendant's argument that he did not know the auto parts sold by his business were stolen. We approved of the government's assertion that the price and nature of the parts could provide circumstantial evidence of the requisite knowledge. Here, indications that the parts were stolen were everywhere. It would require a great amount of deliberate ignorance to believe that legitimate parts suppliers lined up outside of a store to sell individual air bags and other parts, holding their items in duffle bags or plastic bags, often with the wires exposed. The low prices paid to individuals by Beck's Wheels (and the high mark-up placed on the items) would have been further indication of the stolen nature of the air bags. Since evidence showed that Sloan would occasionally staff the intake window, the jury knew that Sloan had seen the individuals with whom Beck's dealt with. The jury had sufficient circumstantial evidence, therefore, to conclude that she knew the air bags were stolen.

■ The defendant also makes a half-hearted argument concerning the structuring count—claiming that there was no evidence that she "assisted in structuring any business policy to provide that checks not be in excess of $9,000," Br. at 18. That is, of course, not the prosecution's charge. She certainly assisted in the structuring of *transactions* that evaded federal reporting requirements, whether or not she structured the *business policy*. Her name was on the accounts used in the scheme. Her relatives were often used to withdraw the funds. She signed many of the $9000

checks. Her involvement was sufficient for jury conviction on this charge.

## B. Downward Departure

■ At trial, the defendant argued that Sloan was entitled to a downward departure on the grounds that she was merely Wooten's girlfriend (the two married after the indictment), and would not have gotten involved in the conspiracy but for that status:

> She wouldn't have initiated this. She wouldn't have known where to start. She wouldn't have known how to contact anybody in California or Alabama or anywhere to talk to junkies coming off the street with air bags. She would have had no capacity whatsoever to deal with in the milieu but for Beck Wooten.

J.A. at 854–55.

On appeal, Sloan's argument has changed. Now, the defendant focuses on an argument she calls "implicit" in her argument at the sentencing hearing, Br. at 21, specifically, that the guidelines applicable to money laundering are aimed at "drug kingpins" and "professional money launderers." Frankly, there is no way to infer *this* argument in the one raised before the lower court. A defendant waives argument for a specific downward departure by failing to raise the issue before the district court. *See United States v. Woody*, 55 F.3d 1257, 1275 (7th Cir.1995); *United States v. Field*, 39 F.3d 15, 21 (1st Cir.1994). Because the defendant failed to argue that her money laundering was outside of the heartland of offenses for which the guidelines provided the enhancement before the district court, she has waived that argument.

## C. Enhancements for Amount of Money Involved and Leadership Role

■ Sloan also appeals the district court's two enhancements. First, the court imposed a six-level enhancement based on the amount of money laundered through financial institutions. Second, the court imposed a four-level leadership/organizational role enhancement under U.S.S.G. § 3B1.1. Because the defendant appeals the factual findings underlying the court's sentence, her appeal is subject to clear error review. *United States v. Hoskins*, 173 F.3d 351 (6th Cir.1999).

Challenging the six-level enhancement, the defendant argues that the district court improperly estimated a two million dollar total for the money laundering conducted under the conspiracy because "simply adding up the checks that were mentioned during the trial ... results in a figure of less than one million dollars." Br. at 34. The probation officer reached this dollar amount by multiplying $9,000 daily by five days a week by sixty weeks (the duration of the conspiracy as stated in the indictment). J.A. at 899 & 925. Performing this calculation produces a total of $2.7 million. The government argues that the court's figure of $2 million is therefore a conservative one.

District courts may rely on estimates where those estimates are supported by the preponderance of the evidence on record. *See United States v. Bahhur*, 200 F.3d 917, 924–25 (6th Cir.2000) (estimating amount of money laundered); *United States v. Brawner*, 173 F.3d 966, 971–72 (estimating loss in fraud case). In this case, Krolikowski testified that every day a $9,000 check was cashed and when that amount was exhausted no more purchases were made. The record contains evidence of the duration of the conspiracy (indeed, some evidence suggested the conspiracy exceeded the time frame described in the indictment). The court's estimate was therefore entirely appropriate. This case differs from the one faced by the Seventh Circuit in *United States v. Johnson*, 185

F.3d 765 (7th Cir.1999). In that case, the appeals court rejected the district court's estimation of the quantity of money laundered (which consisted of averaging the amounts for the first three trips to estimate amount carried on fourth trip) and warned that " '[n]ebulous eyeballing' is not enough." *Id.* at 768. The Circuit Court found that the lower court's method was flawed, since the trips were not a mathematical sample and the average load on three trips had no obvious link to the amount carried on a third trip. Here, the testimony of Krolikowski that a $9,000 check was cashed each day provides evidence of record to justify the district court's calculations. The district court did not need to extrapolate since it had testimonial evidence that the conspiracy engaged in fixed pattern as to cashing checks from the Beck's accounts.

Sloan also argues that because she was unaware of the criminal nature of the conspiracy, the court erred in imposing the money laundering enhancements upon her. The jury concluded, however, that she had knowledge of (or deliberately ignored evidence of) the criminal nature of the enterprise. Because we affirm that finding, we find no merit in this aspect of Sloan's sentencing challenge.

■ Nor is there clear error in the court's imposition of a leadership/organizational role enhancement. The Guidelines explain that among the factors to be considering in determining the role played by a defendant are "the recruitment of accomplices" and "the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 (n.4). Sloan hired employees (according to Krowlikowski's testimony), and undoubtedly played some role in recruiting her numerous relatives involved in the conspiracy. She issued orders to employees, and even issued orders regarding financial matters to Wooten. Though she may not have been as central as Wooten to the conspiracy, she clearly played a leadership role.

D. *Apprendi* Argument

■ Finally, Sloan makes a new argument that the court should have instructed the jury to make a finding concerning the amount of money involved in the conspiracy's structuring of financial transactions. The defendant relies on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which holds that facts that lead to sentences beyond a statutory maximum must be alleged in the indictment and proven to the trier of fact beyond a reasonable doubt. The parties dispute whether this is an appealable issue. The defendant argues that the plain error standard applies because she did not object to the judge's instructions on the structuring count of the indictment. The government argues that no review is permitted because the defendant's attorney jointly drafted, stipulated to, and did not object to the structuring instruction. The government cites to cases on waiver such as *United States v. Sloman,* 909 F.2d 176, 182 (6th Cir.1990): "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." Given that the defense was jointly responsible for drafting the instruction and did not object to the instruction, we conclude that the defendant waived a challenge to the legality of the instructions.

### III. WOOTEN'S ARGUMENTS ON APPEAL

A. Failure to Issue Special Instruction to the Jury not to discuss the case prior to deliberation

■ During the trial, several questions were submitted by the members of the

jury to the trial judge. Wooten argues that it was clear from these questions that the jurors were discussing the case prior to the deliberation phase of the trial, and that the judge erred in denying his counsel's request for a special instruction or warning against premature deliberations. The judge's decision not to give a special instruction is reviewed for abuse of discretion. *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir.1995). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989). Applying this deferential standard, we find no reason to remand for a new trial.

First of all, the district court did remind the jurors not to discuss the case on a number of occasions. On both of the days in which questions were asked by members of the jury, the judge closed the day with a warning to jurors not to discuss the case amongst themselves prior to the deliberation phase. The judge gave a similar warning (on one of the days) prior to a mid-day break. The defendants have not shown that it was an abuse of discretion to give these warnings prior to breaking and at the end of the day rather than immediately after the submission of the questions. The judge reasonably believed that his warnings at the end of the day would be sufficient to deter pre-deliberation discussions.

Second, the questions asked do not actually indicate any pre-deliberation discussions. The first two questions asked for a copy of the defendants' signatures and for the identity of the person who wrote the checks in the event the defendants Sloan and Wooten were out of town. These questions *might* be the product of discussions among jurors, but there is no particular reason to believe that they are.

Another question followed the testimony of Special Agent Booth of the FBI. One juror wanted to know what papers the Agent had been holding in his hands while testifying. The defendant does not explain how this question indicates the jurors were discussing the case among themselves. It really only suggests that a single juror was wondering about the papers.

In oral argument, counsel for the defendant focused on the actual language of the questions, noting that some of the questions used the term "we" to describe the jury. This court is not persuaded that the use of the collective pronoun provides clear enough evidence that deliberations were occurring so as to require a special instruction. As the government noted, it would have been odd for a juror to use the term "I" when asking if the jury could view copies of the defendants' signatures. Absent something more, the judge's decisions as to when to advise the jury not to discuss the case do not amount to reversible error.

Wooten suggests the judge also erred by permitting the recall of Special Agent Booth to explain what he had held in his hands during his testimony (an FBI report, a sketch of Beck's wheels, and an inventory of items taken by law enforcement officers). While Wooten argues this recall is prejudicial, he never points out why.

### B. Admission of testimony concerning unreported robberies

Next, Wooten argues that the court erred in admitting testimony concerning the fact that on two separate occasions Beck's Wheels did not report robberies to the police, even though one of those robberies involved a shooting. J.A. at 504–505. Counsel objected to the government's questioning of Krolikowski as to whether Beck's had ever been robbed (and

whether Beck's contacted the authorities), and the district court overruled the objection. We review a judge's decision to admit evidence under an abuse of discretion standard. *Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152, 157 (6th Cir. 1988).

No abuse of discretion occurred. Essentially, Wooten argues that the evidence was not relevant to the question of knowledge of the criminal nature of the enterprise. The defendants' desire not to draw attention to their business is suggestive of their knowledge of the criminal nature of the enterprise, an element of the crime and one which the defendants contested at trial (and which defendant Sloan contests before this court). Therefore, it was relevant and admissible.

C. Calculation of amount of money laundered

■ Like Sloan, Wooten challenges the six-level enhancement imposed for the amount of money laundered through financial institutions. Our holding for Sloan is equally relevant for Wooten. The estimation by the court was reasonable and probably conservative.

Wooten's argument differs from Sloan's only in that he also asserts that the government failed to show that all of the air bags involved were stolen, and therefore that all of the money transferred through the account was linked to illegal acts. The government was unable to trace all of the air bags recovered, and obviously could not trace those that had already been sold. However, witnesses testified that air bags are sold only through authorized original equipment manufacturers (OEM's) and their dealerships. J.A. at 573–77. Therefore, the district court could have concluded—a conclusion without clear error—that all of the air bags were stolen. Thus, its calculation of the amount of money laundered for the promotion of criminal activity by the conspiracy is free of clear error.

For the foregoing reasons, we AFFIRM the district court.