UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Wayne BROWN, Defendant–
Appellant.

No. 00–2101.

United States Court of Appeals,
Sixth Circuit.

Sept. 17, 2002.

Before SUHRHEINRICH and BATCHELDER, Circuit Judges; LITTLE, District Judge *.

BATCHELDER, Circuit Judge.

Defendant–Appellant Richard Wayne Brown ("Brown") pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, and to one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). He appeals his sentence, arguing that the district court erred in denying him a reduction for acceptance of responsibility; that the court erred in its finding of how much money he laundered; that the court erred in refusing to hold him responsible for no more than $500,000 in fraud and laundering losses; that the court erred in denying his request for a downward departure because his conduct was out of the "heartland" of money laundering; that the court erred by increasing his sentence for abusing a position of trust; that the court erred by increasing his sentence because he was a leader or organizer; that the court erred in accepting hearsay evidence regarding the amount of loss suffered by the victims of his schemes; that the sentence he received violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and that we should remand his case to the district court with instructions to conform the court's written sentence to the oral sentence as recorded in the sentencing hearing transcript. Finding no merit to Brown's claims, we will affirm the judgment of the district court.

Statement of Facts

From 1992 to 1995 Brown worked for a federal prison inmate named Edwin Wood, operating several related businesses locat-

* The Honorable F.A. Little, Jr., United States District Judge for the Western District of Louisiana, sitting by designation.

ed in Battle Creek, Michigan, including First Financial Acceptance Co., Inc., and its spinoff First Financial Investment Co., Inc. (together "First Financial"). Wood and Brown used First Financial and its spinoffs to conduct a variety of investment schemes, in which Wood issued instructions via the phone and the mail, using others to carry out his schemes and handle the day-to-day business. Also involved with Wood and Brown was Robert Wilson, but though Wilson was listed as president and Brown as vice-president, in fact Wilson took orders from Wood and Brown. Brown ran the daily operations of First Financial, and he hired and directed employees.

One victim of First Financial's schemes was Irving Gruber, a New Jersey resident who invested a total of $250,000 through First Financial beginning in 1992, after responding to an advertisement First Financial had placed in the New York Times. Brown, Wood, and First Financial receptionist Norma LaMotte were Gruber's contacts in these transactions. When, prior to making his investment, Gruber wondered whether the investment were too good to be true, Brown—identifying himself as an officer of the company—reassured him and induced him to go ahead and send in the money. Gruber received back only $95,000 of the $250,000 he invested.

A second investor was Jack Manus, who testified that he invested through First Financial in 1992. After he received this first investment back with the promised interest, Manus in 1993 invested $140,000 in "government paper," upon Brown's assurances that the money was "backed up by the state of Michigan." Manus never recovered this investment. Brown also induced Manus to invest $17,000 in "Michi-

gan tax-free bonds," and Manus lost all this money as well.

A third investor, Joseph Kocis, testified that he had read a newspaper advertisement regarding First Financial, had called the number listed, and LaMotte had put him through to Brown. After an initial successful investment through First Financial, Kocis invested $60,000 in "government guaranteed paper," of which he eventually received $15,000 back. When Kocis expressed concern about whether he would receive his $60,000 investment back, it was Brown who reassured him.[1]

A fourth victim, Fred Duffy, invested $2 million through First Financial. He recovered not quite $200,000.

In 1995 First Financial Acceptance was sold, and Brown became self-employed. Brown once more began offering "guaranteed" investments, this time via two entities he created: RMR Benefit Corporation, which was an insurance agency, and Banque de Petite Martinique ("Martinique"), a bank-in-formation located in Grenada. Brown worked with Michael O'Hare, who was a former insurance agent and a co-owner of RMR. Brown also formed Network Travel Ltd. and Network Auto Leasing Ltd., though both businesses were shams through which Brown laundered money, using his employee Benjamin Grab as his representative. Grab also worked for another of Brown's money laundering ventures, Metro Remodeling, in which role Grab assumed the name "Matt Nickel" to conceal his criminal past. A different Brown employee, Craig Thies, also used the name Matt Nickel in working for this entity, as well as for another sham Brown entity called the Restaurant Group,

---

1. Kocis had emigrated to America from Slovakia in 1988, and had lived in a semi-truck while saving money for an education. When he testified at Brown's proceedings, he was working as a dump truck driver.

Ltd. (Brown typically disposed of his fraud money quickly, often within a week.)

Brown's technique was to solicit investments in Martinique, promising a 12% return for investments of between $500,000 and $5 million, assuring investors that Martinique was already chartered by Grenada and that deposits were insured by ITT Hartford through RMR Benefit, and providing investors with balance sheets for ITT Hartford and bond numbers allegedly supplied by that company. In fact Martinique was not yet chartered, ITT Hartford knew nothing of the investments and hence had promised nothing, and the bond number was a fabrication. When one investor asked for additional assurance, Brown arranged for an Illinois accountant named Burton Stern to send a balance sheet that showed Brown's net worth as $30 million.

In 1995 Brown managed to convince a Canadian businessman, Socrates Goulakos, to send him a check for $100,000, though Goulakos shrewdly post-dated and then stopped payment on the check, leaving First of America Bank with the loss when it mistakenly cleared the check. Less fortunate was Robert Smith, a Chicago businessman, who in 1995 invested $350,000 in Martinique, all of which he lost.

Another target for the Martinique scheme was Rabbi Elihu Marcus, who had made a series of investments through First Financial between 1993 and 1995. Marcus lost $132,000 of these investments, though he declined Brown's invitation to invest in Martinique. At one point, when Marcus was asking for assurances that his investments were secure, Brown had O'Hare send Marcus the same fraudulent insurance proofs and audit statement that he had used with other victims in the Martinique transactions.

Brown was prosecuted in the Northern District of Illinois for yet another of his Martinique schemes; this indictment charged Brown, along with his co-conspirator Burton Stern, with wire fraud. This case arose out of false representations the two defendants made to seven victims, all different from the victims in the Michigan state and Western District of Michigan cases. In these deals Stern would arrange for people to obtain large loans from Martinique, and he and Brown would split the substantial loan fees. They obtained from these victims a total of $826,000, and this sum was included in the loss calculations in the present case. The sentencing in the Illinois conviction had not taken place when Brown was sentenced in the present case.

On July 29, 1999, a grand jury indicted Brown on seven counts of wire fraud in violation of 18 U.S.C. § 1343, one count of mail fraud in violation of 18 U.S.C. § 1341, and three counts of "concealment" money laundering in violation of 18 U.S.C. § 1956(a)(1). After the indictment had issued, investigators discovered two additional victims—the Fanellis, a married couple from Pennsylvania, whom Brown had persuaded to roll over their IRAs into CDs at Martinique, based on his promises of 15% guaranteed interest. The Fanellis lost $119,694 on the deal—an amount that was added into the loss calculation, though Brown was not charged with the underlying offense.

Brown entered into a plea agreement in which he pleaded guilty to Count 12 (mail fraud) and Count 17 (money laundering). At sentencing the district court held Brown responsible for over $3.7 million in fraud and money laundering. Brown now appeals the court's sentence.

I. Denying Brown a Reduction for Acceptance of Responsibility

■ Brown contends that the district court erroneously denied him a reduction

for acceptance of responsibility, despite the fact that he pleaded guilty. Where—as here—the relevant facts are contested, we review de novo a district court's denial of a reduction for acceptance of responsibility, and we may not overturn the district court's decision unless it was without foundation. *United States v. Childers*, 86 F.3d 562, 563 (6th Cir.1996).

U.S.S.G. § 3E1.1(a) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, [the court should] decrease the offense level by 2 levels." The Application Note additionally explains that though a plea of guilty "will constitute significant evidence of acceptance of responsibility," a defendant who pleads guilty is not entitled to a reduction as a matter of right, and the acceptance of responsibility indicated by a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n. 3. The finding of acceptance of responsibility is made based on a preponderance of the evidence, *United States v. Thomas*, 74 F.3d 701, 716 (6th Cir.1996), a burden borne by the defendant, *United States v. Walker*, 182 F.3d 485, 487 (6th Cir.1999).

Up to the time of his guilty plea, Brown cooperated with the government as agreed and his conduct was consistent with acceptance of responsibility. After his plea, however, he refused to talk with the probation officer who was preparing his presentence report, even to verify simple details such as his personal and family background. Also after his plea, Brown sent a letter to Wood's counsel which the district

court reasonably construed as an effort to extract more money illegally: in this letter Brown offered "to be forthright and truthful" in testifying at Wood's trial if Wood paid him $9.75 million that Wood allegedly owed. Given these facts, we are unable to say that the district court's decision was without foundation.

## II. The District Court's Loss Calculations

### A. *The Money Laundering Loss Amount*

■ Brown argues that the district court erred by holding him responsible for $3.7 million in money laundering losses. Both the presentence report and the district court held Brown responsible for the same $3.7 million amount in mail fraud and money laundering. The district court made extensive findings as to the amounts that Brown defrauded from various individuals, and these findings were verified through exhibits and testimony at Brown's sentencing hearing. But the record is incomplete regarding what Brown did with all of the money he obtained through fraud, leaving unresolved whether the presentence report simply assumed that the amounts were the same, or whether the report's factual conclusions (which the district court adopted) were based on real findings.[2] Brown, however, did not afford the district court the opportunity to explain itself, because he did not object to the $3.7 million money laundering amount.

To establish a defendant's responsibility under 18 U.S.C. § 1956(a)(1)(B), "the government must prove that he had the specific intent to conceal or disguise the

**2.** Significantly, many of Brown's activities noted in the presentence report were consistent with significant money laundering activities: as noted above, Brown created several shell entities, corporations which he funded but which did not do business with the public; these companies had paid employees but they

did little except receive and disburse funds at Brown's direction; and Brown endowed two employees of these shell companies with false powers of attorney, and had these employees falsely represent themselves by the borrowed name "Matt Nickel."

nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity." *United States v. Loehr,* 966 F.2d 201, 204 (6th Cir.1992). The government bears the burden of establishing the amount of money that the defendant laundered, by a preponderance of the evidence. *United States v. Bahhur,* 200 F.3d 917, 924 (6th Cir.2000).

Because Brown's counsel failed to object on these grounds during the sentencing proceedings, we review the district court's money laundering loss determination for plain error. *United States v. Koeberlein,* 161 F.3d 946, 949 (6th Cir.1998). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Schulte,* 264 F.3d 656, 660 (6th Cir.2001). Regarding the fourth element, "the discretion conferred by Rule 52(b) should be employed 'in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

Although the record is incomplete with regard to the ultimate disposition of much of the fraudulently obtained money, it is undisputed that Brown initially deposited most of the funds into apparently legitimate bank accounts before immediately disposing of the funds further. Each of these deposits was a financial transaction using money that was the proceeds of specified illegal activity, and each of these deposits was clearly designed to conceal from the victim the ultimate use of the money. And it is undisputed that none of the money was ultimately used for the purposes for which Brown had solicited it. Under these circumstances, we cannot say that any error that has occurred here affecting Brown's substantial rights; we are certain, however, that any error that may have occurred did not affect the fundamental fairness of the proceedings. Consequently, we find no plain error, and we affirm the judgment of the district court on this matter.

**B. *Capping at $500,000 the Losses Attributable to Brown***

On March 9, 2000, Brown's prosecutor sent a letter to the federal prosecutor in the Northern District of Illinois who was prosecuting Brown's offense there; the letter regarded the possibility of concurrent sentencing of the two cases, and noted that "if the sentencing decision in the Illinois case includes the loss of approximately $500,000 attributable to the Michigan case, the undersigned believes that concurrent sentencing would be proper in later a Michigan decision. That belief, of course, is not binding on any court." Brown's plea agreement additionally mentioned the possibility of concurrent sentencing with Brown's Northern District of Illinois conviction, but the agreement mentioned no dollar amount, and it specifically provided that the concurrent sentencing possibility was merely a possibility agreed to by the parties and was not binding on the court. Nevertheless, Brown now appears to argue that the March 9, 2000, letter somehow became part of his plea agreement, or that it induced him to enter into the agreement, and he wants us to enforce that agreement.

We say that Brown "appears to argue" this, because though he raised the issue below, on appeal he devotes only three sentences to the argument, in his reply

brief. We find that Brown has waived this argument by failing adequately to explain his claim. *United States v. Layne*, 192 F.3d 556, 566 (6th Cir.1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[.]") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997)). Even without waiver, Brown's "apparent" argument is meritless, since he gives us no reason to infer that the amount mentioned in the March 9, 2000, letter was somehow incorporated into the plea agreement.

III. Sentencing Brown in the Heartland of Money Laundering

■ Brown argues that when he disposed of his victims' money he did so merely by depositing it in or withdrawing it from banks, and hence his conduct was out of the "heartland" of money laundering offenses and the district court should have departed downward in sentencing him. But Brown failed even to request a downward departure on these grounds from the district court, and hence he is deemed to have waived his request. *United States v. Wooten*, 39 Fed.Appx. 83 (6th Cir.2002) ("A defendant waives argument for a specific downward departure by failing to raise the issue before the district court. Because the defendant failed to argue that her money laundering was outside of the heartland of offenses for which the Guidelines provided the enhancement before the district court, she has waived that argument."); *United States v. Ukomadu*, 236 F.3d 333, 340 (6th Cir.2001) ("A defendant waives the right to appeal an application of the Sentencing Guidelines when he fails to object in the trial court.").

IV. Enhancement for Abuse of Trust

The district court applied a two-level increase to Brown's sentence under U.S.S.G. § 3B1.3, which provides for such an increase "[i]f the defendant abused a position of … private trust … in a manner that significantly facilitated the commission or concealment of the offense[.]" Brown objected to this before the district court on the grounds that since he had in fact occupied the official positions in Martinique and First Financial that he told his victims he occupied, he made no false representations. On appeal he has discarded this rationale, and presents instead three new reasons why the district court erred by applying the increase: (1) the presentence report asserted that "his *frauds* were perpetrated through his false representations," and not that his *money laundering* was so perpetrated; (2) the indictment did not mention that Brown falsely or truthfully claimed to be a bank officer, and hence the enhancement violated *Apprendi;* and (3) Brown was not in a trust relationship with the victims and could not be punished under the applicable 1994 Guideline for his acts, so by applying the enhancements under this section the district court violated the Constitutional prohibition against ex post facto laws. Because Brown failed to raise these rationales before the district court, we review only for plain error.

■ Regarding (1), because Brown failed to raise these factual objections before the district court, we are faced again with the paucity of record findings on the money laundering aspects of Brown's activities. We are consequently in no position to find that the district court erred in its finding, and we find no plain error on this ground. Regarding (2), the enhancement did not violate *Apprendi* because the district court did not sentence Brown above the statutory maximum of the offenses he was indicted for: on his fraud count Brown was exposed to a minimum of

zero and a maximum of 60 months, and on his laundering count a minimum of zero and a maximum of 240 months; under the Guidelines he was exposed to a range of 87 to 108 months for fraud and 135 to 168 months for laundering; and he received sentences of 60 months and 135 months, respectively.[3] Regarding (3), we find that the district court had good reason to find that Brown was in a trust relationship with his victims: he acted as the president of several corporations, he exercised considerable discretion, he directed the activities of others, and he issued his assurances to his victims when acting in his capacity as president. We conclude that there is no plain error here.

## V. Finding that Brown was a Leader or Organizer

■ The district court applied a four-level increase under U.S.S.G. § 3B1.1(a), which allows such an increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" Brown argues that the evidence did not support a finding that he organized or led five or more participants, and instead the evidence indicated that Wood was the only leader. Brown objected to this finding below for the same reasons he does now, so we review for clear error the district court's decision to apply this enhancement. *United States v. Haun,* 90 F.3d 1096, 1102 (6th Cir.1996).

We find no clear error. In Brown's First Financial deals, the district court could have found that Brown directed Wilson, Lamotte, three office workers, and three other people who played uncertain roles. Regarding Brown's Martinique schemes, the court could have found that he directed O'Hare, LaMotte, the three office workers, Grab, Thies, and Stern. Though Wood was also apparently a leader, this fact does not thereby absolve Brown. *See* U.S.S.G. § 3B1.1 cmt. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

Brown also argues that the district court found that he was a leader or organizer only in his mail fraud activities, but not in his money laundering. This is the first time Brown has raised this argument, and hence we review for plain error. His objection fails under plain error review because the record is incomplete, and what evidence is on the record indicates that Brown was directing the activities of others when he ran his shell companies.

## VI. Use of Hearsay Evidence in Determining Amount of Losses

At the sentencing hearing the government produced two witnesses: an IRS agent named Ugorowski, who had investigated Brown's case, and an FBI special agent from Michigan who had not investigated the case but testified on behalf of an unavailable special agent who had. Through their testimony the government introduced 34 exhibits, including summaries of the losses; reports from Ugorowski's interviews with Wilson, O'Hare, Thies, and Grab; Brown's Illinois indictment; testimony from the Michigan state trials of Brown and his co-conspirators; and various evidences of Brown's frauds, such as check stubs and letters he had signed.

---

**3.** Brown also argues that the district court violated *Apprendi* by increasing his sentence under U.S.S.G. § 3B1.3, and by holding him responsible for a greater amount in losses than was alleged in his indictment. Both of these challenges fail for the same reason noted above: the sentence he received did not exceed the statutory maximum of the offenses charged in the indictment.

Brown objected, arguing that the prosecutor had given him much of the material only that morning, and hence he had not had time to prepare responses. The district court nevertheless allowed the evidence in, and Brown now argues (1) that because his counsel did not have sufficient notice to let him rebut the evidence presented by the government, his sentence is based on hearsay of doubtful reliability; (2) that Duffy's $1.8 million loss was not sustained by the evidence; and (3) that the Fanellis' losses and the Michigan state case losses Brown was held responsible for were not adequately proven to be part of a common scheme.

Under U.S.S.G. § 6A1.3, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy." In addition to the reliability requirement, the defendant must be given the opportunity to rebut the evidence. *United States v. Silverman*, 976 F.2d 1502, 1515 (6th Cir.1992). We do not require the government to prove by clear and convincing evidence those facts upon which the court should rely in determining the sentence pursuant to the Guidelines; rather, the government must prove its facts by a preponderance of the evidence. *United States v. Carroll*, 893 F.2d 1502, 1506 (6th Cir.1990). We review the district court's reliability finding for abuse of discretion, *Corbin*, 998 F.2d at 1386, but we review for plain error Brown's second and third objections, because he did not raise them before the district court.

█ It appears that Brown's counsel had for some time had access to all the material the prosecutor presented at the sentencing hearing, but the prosecutor had not decided until the last minute which of these materials he would focus on and had hand-delivered those materials to Brown's counsel only on the day of the hearing. There is no indication that the government introduced anything surprising at the hearing, and on the contrary the prosecutor merely substantiated the materials that were in the presentence report. Given these facts, we see no reason to find an abuse of discretion.

█ We also find no plain error, or even an abuse of discretion, in regard to the evidence supporting the loss Mr. Duffy suffered, or regarding the finding that the losses covered in the Michigan state case and by the Fanellis were part of a common scheme. Duffy did not respond to the government's subpoena, so the government instead proved the loss through Ugorowski—through his oral account of his interview with Wilson, his written summary of that interview, and his testimony based on his own investigation. The Fanellis suffered their losses, according to the presentence report, through Brown's Martinique schemes, which were part of the instant offense; and Brown's Michigan conviction was based on the same fraudulent institutions as here.

VII. Remand to Conform the Written Sentence to the Hearing Transcript Sentence

█ Though Brown's Guidelines sentencing range on Count 12 (for fraud) was 87 to 108 months, the statutory maximum for that count was 60 months. The presentence report had recommended the statutory maximum sentence for this count. The written judgment the district court issued on September 15, 2000, agreed with this recommendation, committing Brown "to be imprisoned for a term of sixty (60) months as to Ct. 12[.]" But according to the transcript of the sentenc-

ing hearing held earlier the same day, the district court had orally sentenced Brown as follows: "I'm going to sentence you as to Count 12 ... [to] 12 months[.]" On the basis of this discrepancy, Brown argues that we should remand to the district court with instructions to conform his written sentence to the oral sentence.

Brown invokes the traditional rule that when an oral sentence conflicts with a written sentence, the oral controls. *See United States v. Cofield*, 233 F.3d 405, 406–07 (6th Cir.2000) (noting that this rule is "widely accepted"). Another common component of this rule is that it applies only where the oral pronouncement was unambiguous. *See United States v. Johnson*, 24 Fed.Appx. 417 (6th Cir.2001) ("In the case at bar, the oral pronouncement of sentence was unambiguous. Therefore, the written judgment is viewed as a clerical mistake which may be corrected by the district court at any time pursuant to Fed. R.Crim.P. 36."); *United States v. Villano*, 816 F.2d 1448, 1451 (10th Cir.1987) ("When an orally pronounced sentence is ambiguous ... the judgment and commitment order is evidence which may be used to determine the intended sentence. This is the purpose of the written order: to help clarify an ambiguous oral sentence by providing evidence of what was said from the bench.") (internal citations omitted).

Though the conflict is not facially ambiguous—the numbers simply contradict one another—there is a compelling reason to find ambiguity: a 12-month sentence would have been a significant downward departure, the district court would have had to explain its reasons for this departure specifically at the sentencing hearing, and the failure to do so could constitute plain error. 18 U.S.C. § 3553(c); *United States v. Thomas*, 24 F.3d 829, 833–34 (6th Cir.1994). The district court did not explain its 12-month sentence, nor did it give

any indication that it was departing at all, and the evidence points to the likelihood of a recording error. (The recording of the sentencing hearing is irrecoverable.) We conclude that the district court's oral sentence was ambiguous, and we decline to disturb Brown's written sentence.

Conclusion

For the foregoing reasons, we AFFIRM the sentence imposed by the district court.