NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0384n.06

No. 12-3910

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 17, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TERRY DURBIN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| COLUMBIA ENERGY GROUP PENSION | ) | THE SOUTHERN DISTRICT OF |
| PLAN, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | OPINION |

Before: COOK, WHITE, DONALD, Circuit Judges.

BERNICE B. DONALD, Circuit Judge. The underlying conflict in this case is whether Terry Durbin affirmatively elected to have his pension calculated under the "Account Balance" method or passively elected to use the default "Final Average Pay" method by doing nothing. Our task, however, is simply to determine whether the NiSource Benefits Committee acted arbitrarily and capriciously in determining that Durbin elected to use the Account Balance method. We hold that it did not and, accordingly, affirm the decision of the district court.

I.

Terry Durbin has worked for Columbia Energy Group ("Columbia Energy") as a welder since 1981 and has participated in the Columbia Energy Group Pension Plan (the "Plan") since the

beginning of his employment. NiSource, Inc. ("NiSource") maintains the Plan for the benefit of the employees of Columbia Energy and nine other subsidiaries of NiSource. NiSource appoints members to the NiSource Benefits Committee ("Committee"), a body that administers the Plan, vested with discretionary authority to interpret Plan documents "including . . . issues of fact and questions of eligibility, benefits, status, and rights of participants." Columbia Energy contributes to the Plan through a trust fund (the "Trust") that holds assets and pays benefits on behalf of the Plan.

When Durbin signed up for the Plan, his benefits were calculated according to the Final Average Pay ("FAP") method.[1] In 1999, NiSource and its subsidiaries amended the Plan to allow employees to elect to have their future pension accruals determined according to the Account Balance ("AB I") method.[2] In early 2000, Durbin attended a meeting in which NiSource personnel explained the changes and distributed a document specifying the time frame and method for making the election. Employees who wanted to participate in the AB I program had to place a telephone call to "The Benefits Source" and make the election by April 30, 2000. Employees who did nothing would continue in the default FAP program. Once made, the election was irrevocable.

---

[1]Under the FAP method, pension benefits are calculated at the end of employment, by taking one-third of the total compensation paid to the employee for the thirty-six months the employee receives the most compensation, selected from the sixty months immediately preceding termination of employment. Because benefits are calculated at the end of employment, there is no ongoing individualized fund for employees enrolled in this program.

[2]Under the AB I method, pension benefits accrue over time, according to a number of variables, and the current balance is reflected in an account.

The parties dispute whether Durbin elected to participate in the AB I program.[3] Durbin alleges that he indicated on a paper ballot form—which the representatives at the meeting explained was "just for our records"—that he intended to continue his participation in the FAP program, but neither party has a record of this paper ballot. Hewitt Associates ("Hewitt"), the Plan's third-party record-keeper, maintains the Plan's electronic database records and shows that Durbin called The Benefits Source telephone number four times on April 27, 2000. The record shows that he spoke to Representative 16092 at 10:15 a.m. for general Plan information; he called again at 10:37 a.m., this time speaking to Representative 16085, and abandoned the call; he called Representative 24515 at 10:49 a.m. and was transferred to another team member; and he again spoke to Representative 16085 at 10:44 a.m. and elected to participate in the AB I program. These last two entries appear in the record out of chronological order. Durbin averred in an affidavit that he did not place a call for the purpose of electing to participate in the AB I program.

On April 27, 2000, Hewitt mailed Durbin a confirmation letter regarding his election to participate in the AB I program. The administrative record also includes numerous documents exchanged between the Plan and Durbin over the next decade. Documents entitled "Columbia Retirement Plan Account Balance Option Account Statement" showing the annual account balance for the previous year were sent to Durbin for each year from 2004 to 2010. Durbin signed three different forms entitled "Plan Account Balance Option Preretirement Death Beneficiary Designation

---

[3]While the parties do not discuss which method is more financially beneficial overall, Durbin avers that he intended to work at Columbia Energy until his retirement, so he understood that the FAP method would be in his best interest.

Form," each time designating his wife as his beneficiary. The option to designate was only available to AB I participants; FAP benefits automatically go to the spouse of a deceased participant. The record also shows that Durbin was sent documents entitled "Summary Plan Descriptions" that would have been specific to the AB I program.

In 2010, Durbin began to make plans for his retirement and contacted Hewitt because he thought the amounts shown on his online account balance appeared low. Hewitt told him that he enrolled in the AB I program in 2000 via telephone.

In August 2010, Durbin, through counsel, filed a formal request for a determination by the Committee of his right to have his benefit calculated under the FAP program. The Committee wrote a letter denying the request on grounds that Durbin had elected to participate in the AB I program in lieu of the FAP program. With the letter, it included a "screen shot" copy of the telephone record from April 27, 2000, and copies of the various forms exchanged over the years, each of which showed that Durbin participated in the AB I program. Durbin indicated his intention to appeal and asked why the last two entries in the telephone record were out of chronological order. The Committee responded that it could not determine with certainty why the calls were logged out of order, but that it may be due to the fact that the call was internally transferred to the same representative involved in the abandoned phone call.

In December 2010, Durbin filed a formal appeal with the Committee. He argued that he indicated his desire to remain in the FAP program on a paper ballot form at the 2000 meeting, that

the electronic records were inaccurate because the calls were logged out of chronological order, and that he had believed that the references to the "Account Balance Option" on his annual statements were only references to the size of his account in the FAP option. He also alleged that Beth Aman, a NiSource human resources employee who had been at the 2000 meeting, had offered to help him find information, but that someone at NiSource told her to "leave it alone."

In response to these assertions, the Committee conducted an investigation. A representative spoke with Ms. Aman, who reported that she did not recall anything specific about Durbin's election. The representative also contacted Hewitt about the paper ballot and other records. Hewitt responded that it did not have the paper ballot; it only maintained electronic records; that Durbin's records were similar to those of other pension benefit participants; and that its standard process is to send people such as Durbin the "Account Balance Pension Option Summary Plan Description," though it could not affirmatively say whether it sent one to Durbin. Finally, the representative reviewed records of employees similarly situated to Durbin and found that there were no anomalies in Durbin's record. The Committee upheld its prior determination that Durbin was an AB I participant, explaining in a letter dated May 14, 2011, that there was no indication that the records were inaccurate and that, while data entry errors are not impossible, Durbin had the opportunity to object to any error when he received the confirmation letter. The Committee wrote that it believed that Durbin would have objected to any error given his statements that at the time he understood the difference between the two programs. The Committee also noted that the documents and forms exchanged should have sufficiently alerted Durbin if there had been an error because the differences in the programs were

adequately explained at the 2000 meeting and in subsequent literature. It concluded that Durbin did make the AB I election in 2000 and that it would continue to calculate his benefits accordingly.

Having exhausted his administrative remedies, Durbin brought this claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for a declaration that he is entitled to have his benefit calculated under the FAP program. Both parties moved for judgment as a matter of law on the administrative record. The district court applied the arbitrary and capricious standard of review and determined that the Committee's decision was reasonable because the evidence that Durbin elected to participate in the AB I program outweighed evidence to the contrary. The court denied Durbin's motion and granted the Plan's motion. Durbin now appeals.

II.

Durbin claims that the district court erred by granting summary judgment to the Plan because the Committee's decision was not based on a principled process or supported by substantial evidence. According to Durbin, the Committee ignored his affidavits and assertions, improperly evaluated the telephone records, and improperly relied on records of the various forms and documents. He also claims that the Committee's decision was infected by a conflict of interest that is evident from the Committee's desire to save money and from it's failure to investigate his conversation with Ms. Aman.

We review a district court's grant of summary judgment in an ERISA action de novo, "applying the same standard of review to the administrator's action as required by the district court."

*Bidwell v. Univ. Med. Ctr., Inc.*, 685 F.3d 613, 616 (6th Cir. 2012). Summary judgment is appropriate where the pleadings and affidavits show that there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In an ERISA case, the relevant genuine issue of material fact is whether the administrator's decision was appropriate, in light of the applicable standard of review. *See Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 342 (6th Cir. 2011) (asking whether there was any "genuine issue of material fact as to whether the Plan Administrator's actions were arbitrary and capricious"). In determining whether the Committee erred by denying Durbin's request to have his benefits calculated under the FAP program, we consider only the administrative record available to the Committee. *Miller v. Metropolitan Life Ins. Co*., 925 F.2d 979, 986 (6th Cir. 1991).

A. Standard of Review

Where a plan administrator has denied benefits, we use the deferential "arbitrary and capricious" standard so long as the administrator has "discretionary authority to determine eligibility for benefits or to construe the terms" of the plan. *Farhner*, 645 F.3d at 342 (internal quotation marks omitted); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties agree that the Plan vests the Committee, the Plan administrator, with such discretion. If we had any doubt on the matter, it is resolved by language in the Plan documents giving the Committee discretion "to interpret the Plan documents and documents related to the Plan's operation (including . . . issues of fact and questions of eligibility, benefits, status, and rights of participants.)." This is

very similar to language that we held granted sufficient discretion to invoke arbitrary and capricious review in *Farhner*, 645 F.3d at 342.

Arbitrary and capricious review is the "least demanding form of judicial review of administrative action." *Id.* (internal quotation marks omitted). We must uphold the administrator's decision as a matter of law if the administrator used a principled reasoning process and if the decision is supported by substantial evidence. *Balmert v. Reliance Standard Life. Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010); *see also Davis v. Kent. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) ("When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003).

Arbitrary and capricious review, however, is "tempered" if the administrator is under a conflict of interest. *Univ. Hosps. v. Emerson Elec. Co.*, 202 F.3d 839, 846, 846 n.4 (6th Cir. 2000) (noting that we should be especially vigilant where the plan sponsor bears all the risk of paying the claim and also appoints the administrator who makes benefit decisions); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008) (noting that a conflict exists where the administrator is responsible for both determining eligibility as well as paying benefits). When a conflict exists we must consider it as a factor in our review. *Univ. Hosps.*, 202 F.3d at 846; *see also Farhner*, 645 F.3d at 342. Durbin argues that a conflict exists because NiSource funds the Plan's benefits through its subsidiaries while NiSource's Chief Executive Officer appoints members to the Committee.

Columbia Energy argues that there is no conflict because Plan funds are held in the Trust and because NiSource subsidiaries, not NiSource itself, fund the Trust. We have never addressed whether a for-profit company may avoid a conflict by holding pension funds in a trust. *See Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan*, 346 F. App'x 1, 5 (6th Cir. 2009) (concluding that a non-profit board of trustees was not under a conflict where it both administered and funded the plan because the trustees did not receive a financial benefit). *See also Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) (noting that the existence of a trust is not determinative of whether a conflict exists); *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1026-27 (9th Cir. 2008) (holding that "even when a plan's benefits are paid out of a trust, a structural conflict of interest exists"); *but see White v. Coca-Cola Co.*, 542 F.3d 848, 858 (11th Cir. 2008) (holding that no conflict exists where benefits are paid through a trust funded through periodic contributions such that the provider incurs no immediate expense from benefit payments). We need not determine whether the tempered standard applies here, however, because Durbin's claim fails under either standard. Thus, we assume *arguendo* that one exists and review the record for any evidence that a conflict of interest influenced the plan administrator's decision. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006).

B. Burden of Proof

In ERISA actions, the claimant bears the burden of proving that the administrator's decision denying benefits was arbitrary and capricious; if the claimant cannot meet this burden, we must sustain the administrator's decision as a matter of law. *Farhner*, 645 F.3d at 343. Nevertheless,

Durbin argues that this case presents unique circumstances justifying a shift in the burden or proof. This is a legal question that we review de novo. *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006).

Durbin argues that because the Committee is the sole custodian of the relevant evidence and because he would have to prove a negative to show that he did not elect to participate in the AB I program, fairness demands that the burden should shift to the Committee to prove that he made the election. Durbin misunderstands our role. We do not make independent factual findings of whether he made the election; we merely determine whether the Committee acted in a principled way in making its own factual findings, which must be supported by substantial evidence. *See Balmert*, 601 F.3d at 501. We consider this argument only to the extent that these circumstances could justify shifting the burden to the Committee to prove that it did not act arbitrarily and capriciously in rendering its decision.

Durbin cites several ERISA cases in which the burden was shifted to the administrator, but these cases do not suggest that the burden must shift here. Two of the cases involve the issue of who bears the burden of proving a legal question. *See Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 367 (6th Cir. 2009) (administrator bears the burden of proving that deferential review applies); *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 957 (6th Cir. 2004) (administrator bears the burden of proving that default rules should not apply). In the third, we placed the burden on the administrator to show that an item was excluded from coverage. *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002). Durbin also cites several opinions

noting that it is difficult to prove a negative, but these cases do not suggest that this is an adequate justification for shifting the burden in an ERISA case. *See*, *e.g., Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2823 (2011) (campaign finance claims); *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1020 (6th Cir. 1995) (explaining why the burden is normally on the policy holder in an insurance case by noting that it is difficult to prove a negative).

We see nothing in Durbin's arguments, nor anywhere else, that could justify shifting the burden to the Committee. Any problematic factual situation presented by the fact that the Committee has more ready access to the record-keeping body is already captured by the arbitrary and capricious standard because we must review whether the Committee used a principled reasoning process. *See Belmert*, 601 F.3d at 501. Nor do we shift the burden of proof every time there is a shift in factual circumstances. In fact, Durbin's own arguments undermine the suggestion that we should shift the burden here because in doing so we would require the Committee to itself prove a negative — that it did not act arbitrarily and capriciously. The burden of proof thus remains on Durbin.

III.

The Committee explained its decision to calculate Durbin's benefits under the AB I plan and the evidence it relied upon in a letter to Durbin's counsel dated May 14, 2011. First, it considered the electronic records maintained by Hewitt, and it investigated Durbin's file for any anomalies as compared to similarly situated employees. These records, including the phone log from April 27, 2000, show that Durbin elected to participate in the AB I program and that there was no record of

- 11 -

the paper ballot from the 2000 meeting. Second, it considered Durbin's statements that he did not make the election and his suggestion that the phone log entry was in error. The Committee had previously investigated the phone log, and, though it acknowledged that errors are possible, it did not believe the fact that two entries appear out of chronological order suggests that the representatives entered the election of the wrong participant. The Committee explained that if the entry had been in error, it believed that Durbin would have noted the error when he received the confirmation letter, especially given his affidavit indicating that he understood the differences between the two programs. Third, the Committee considered the annual statements referencing the "Account Balance Benefit Option," the beneficiary designation forms for the "Account Balance Option," and Durbin's statement that he had not understood these documents. Because the plans had been adequately explained in various staff meetings, the Committee believed that the record accurately reflected Durbin's election. The Committee also noted that the beneficiary forms would not have been used if Durbin were in the FAP program because the benefit automatically goes to a surviving spouse. Finally, the Committee considered Durbin's statements regarding the assistance Ms. Aman allegedly gave him. In its own investigation, the Committee found that Ms. Aman was not able to recall anything to assist the determination. Considering all of this evidence together, the Committee concluded that Durbin had elected to participate in the AB I program and that to allow him to switch to the FAP program after a decade of hindsight would be unfair.

This process was reasoned and took into account all available evidence. The committee investigated Durbin's assertions that he did not make the election and found only evidence indicating

the opposite. While Durbin correctly notes that the Committee did not simply take Durbin's assertions as fact, the Committee acted reasonably in evaluating whether these claims were true in light of its own records. Indeed, we expect the Plan to "establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits." *Kennedy v. DuPont Savings & Inv. Plan*, 555 U.S. 285, 875 (2009). This would make little sense if the Plan was required to completely disregard its own records when a participant asserts the opposite. The absence of the paper ballot indicates nothing as, by Durbin's own admission, participants could only make an election via telephone.

Nor do we conclude that the Committee was unreasonable in finding that the chronological anomaly in the phone log was not evidence of an error in identity. The log itself shows four entries in the following order: Durbin called Representative 16092 at 10:15 a.m. for general Plan information, he called Representative 16085 at 10:37 a.m. and abandoned the call, he called Representative 24515 at 10:49 a.m. and was transferred to another team member, and he again spoke to Representative 16085 at 10:44 a.m. and elected to participate in the AB I program. An error in identity would be especially odd considering the requirement that participants provide personal information, such as a social security number and a "PIN" number, before making an election.

We also disagree with Durbin's suggestion that the Committee should not have considered the confirmation letter, account statements, or beneficiary designation forms. It was reasonable for the Committee to rely on electronic records showing that a confirmation letter was mailed and on Hewitt's standard process for mailing documents to evaluate the truth of Durbin's assertions. Durbin

argues that such records do not prove that he received the letter, but neither does he affirmatively deny receiving it. He also argues that it would not have mattered if he had objected immediately because the plan documents state that an election was irrevocable. However, an objection made when Durbin was put on notice rather than his objection made over a decade later certainly would have been more believable, which was the relevant issue. As for Durbin's arguments that he cannot have been expected to understand the account statements or beneficiary designation forms, we conclude that the Committee acted reasonably in concluding that these documents put Durbin on notice of any error in light of the fact that staff verbally explained the programs and the fact that Durbin made statements that understood the programs. The Committee's reliance on these records was neither unprincipled nor unreasonable.

Finally, we turn to the conflict of interest factor. Under our case law, a purported conflict only affects our analysis if the plaintiff provides "significant evidence" that the conflict motivated the decision at issue. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). Durbin presents two pieces of evidence: 1) that NiSource converted to the AB I plan in the first place to save money and 2) that the Committee failed to investigate Durbin's conversation with Ms. Aman. The fact that NiSource offered the AB I program option in order to save money is merely a suggestion that a conflict exists and that we should look for evidence that this influenced the Committee's decision. The allegation about Ms. Aman is more serious. According to Durbin, he contacted Ms. Aman, the human resources staff member who attended the 2000 meeting, and she initially offered to help him, but later told him that she had been instructed to "leave it alone." It is not clear what

kind of help Ms. Aman allegedly promised to provide, but the Committee reports asking her what she remembered about her interactions with Durbin and she did not recall anything helpful. In light of the Committee's other actions, this does not indicate that the Committee's decision was motivated by a conflict of interest. As the Supreme Court has noted, where the administrator has taken steps "to promote accuracy," a conflict weighs less heavily. *See Metro. Life Ins. Co.*, 554 U.S. at 117. Such is the case here. In addition to reviewing its records and investigating Durbin's assertions, the Committee also investigated the accuracy of the records of Durbin's election by looking for anomalies as compared to similarly situated employees. These efforts at accuracy outweigh the suggestion that Ms. Aman was told to stay out of the situation. We conclude that the Committee's decision to calculate Durbin's benefits under the AB I program was reasoned and supported by substantial evidence.

There is no genuine issue of material fact as to whether the Committee's decision was appropriate, and the decision was not arbitrary and capricious. Accordingly, we must sustain the Committee's decision as a matter of law. *See Farhner*, 645 F.3d at 343.

IV.

For the foregoing reasons, we affirm the district court's decision upholding the Committee's determination that Durbin elected to participate in the AB I program and is not entitled to have his pension benefits calculated under the FAP program.