In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2659

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARIUS HOLLINS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 376—**Harry D. Leinenweber**, *Judge.*

———————

ARGUED APRIL 12, 2007—DECIDED AUGUST 17, 2007

———————

Before RIPPLE, EVANS and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Darius Hollins was convicted of conspiracy and attempt to import cocaine. *See* 21 U.S.C. §§ 952, 963. He initially was sentenced to a term of 188 months' imprisonment. In a prior appeal, we vacated that sentence and remanded for resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005). *United States v. Chairs*, 141 F. App'x 467, 468 (7th Cir. 2005). On remand, the district court imposed a sentence of 151 months' imprisonment. Mr. Hollins timely appeals his sentence. For the reasons stated in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. The Facts Presented at Trial and Mr. Hollins' Conviction

Mr. Hollins was charged and convicted for his role in a scheme to smuggle cocaine from Jamaica. The indictment charged that he and others, including Carl Wilson, had conspired with "Mark," their drug contact in Jamaica, to import cocaine into the United States. It also charged Mr. Hollins with two specific attempts to import cocaine into the United States and charged a third attempt involving only Wilson and Mark.

At Mr. Hollins' trial, the Government produced substantial evidence of the two individual trips charged in the indictment. The first of these trips ("the Reynolds trip") involved three women couriers, Sheron Reynolds, Tammie Dixon and LaTonya McDonald, who testified at Mr. Hollins' trial. According to the women, Reynolds had been recruited by Wilson, and she recruited Dixon and McDonald. Reynolds and Dixon met with both Wilson and Mr. Hollins before their trip, and the night before they left, all three women were briefed by both men. Mr. Hollins negotiated the women's fees, and Wilson transported them to the airport and provided them with significant cash for the deal. Upon arriving in Jamaica, the women were met at the airport by "Marcus," the Jamaican contact. Marcus took them to a hotel where they stayed for several days. On the day before the women were scheduled to leave, Marcus arrived at the hotel and furnished them with pouches that contained cocaine, as well as lubricating jelly. He also instructed them on how to carry the cocaine in body cavities. The following day, Marcus

returned and drove the women to the airport. Upon arriving at O'Hare Airport, the women were stopped by customs officials who discovered their illicit cargo. Mr. Hollins stipulated that the total amount of cocaine recovered from the women was 765 grams. On the basis of this incident, the jury convicted Mr. Hollins of attempted importation.

The Government also charged Mr. Hollins with an attempt to import cocaine based on a trip taken by Carlos Stewart and his girlfriend ("the Stewart trip"). According to trial testimony, Mr. Hollins had recruited Stewart through Stewart's cousin, had paid Stewart's expenses and a fee and served as Stewart's contact while Stewart was in Jamaica. As the women involved in the Reynolds trip had testified, Wilson drove the couriers to the airport and provided the cash for the buy. Mark met them at the airport in Jamaica and took them to a hotel. He returned several days later with cocaine stashed in cans labeled as a Jamaican food product and drove the couple to the airport. Stewart was apprehended upon entering the United States and, Mr. Hollins stipulated, 1702.3 grams of cocaine were found in the cans. The jury acquitted Mr. Hollins of the attempt charge based on this incident.

In addition to these specifically charged incidents, the Government also presented, in support of its general conspiracy charge, evidence at trial of an additional trip ("the Clemons trip"). According to trial testimony, Mr. Hollins asked Vincent Clemons to travel to Jamaica. Clemons paid for his own flight, but Mr. Hollins both arranged the flight and set Clemons up in a hotel once he arrived. Once Clemons was in the Jamaica hotel, Mr. Hollins contacted him and asked him to do Mr. Hollins a "favor" by bringing something back to the United States.

He told him that a man named "Mark" would be in touch shortly with directions. Mark later called Clemons and arranged a meeting. At the meeting, Mark told Clemons that he would be smuggling liquid cocaine into the United States in champagne bottles that he could purchase from a certain duty-free store in the Jamaican airport. Clemons did as instructed and was not apprehended on his entry to the United States. He turned over the bottles to Mr. Hollins. Aside from the trip expenses and reimbursement of the $45 cost of the "champagne," Clemons testified that he received no additional compensation. The Government produced Clemons' customs declaration from this trip on which he had claimed six bottles of champagne.

Based on the above evidence presented at trial, the jury convicted Mr. Hollins of the conspiracy charge.

### B. The First Sentencing Proceeding

In preparation for Mr. Hollins' initial sentencing hearing, the Government prepared its version of the offense. It maintained that, although the evidence at trial addressed only three particular runs to Jamaica (the Reynolds trip, the Stewart trip and the Clemons trip), the conspiracy actually involved at least six trips and significantly higher amounts of cocaine than the Government had attempted to prove at trial.

In support of its position that Mr. Hollins should be sentenced on the basis of transactions involving roughly twelve kilos of cocaine, the Government attached numer-

ous documents to its sentencing memorandum.[1] These documents included the reports of interviews with five individuals involved in the conspiracy, plea agreements entered by several of Mr. Hollins' co-defendants (Clemons, Dixon, McDonald, Reynolds and Stewart), lab reports documenting drug quantities and testimony from related state court proceedings. One of these documents was a record of the statement a woman named Annette Addison had made to United States Customs officials in September 1998. According to that record, Addison stated that, beginning in 1992 or 1993, she went on several trips out of the country on behalf of the Hollins-Wilson conspiracy and eventually became a recruiter who located, for a finder's fee, additional couriers for Mr. Hollins and Wilson. She testified generally on the operations of the scheme and described it in a manner consistent with the testimony others had provided about the mechanics of travel and about the dealings in Jamaica. She also specifically stated that, in 1996, she had traveled with McKinley Williams and Angela Butler and had attempted to return with wine bottles containing liquid cocaine ("the Addison II trip"). She stated that Wilson had made the arrangements and had provided Addison with $65,000 to purchase the cocaine. On arriving at the airport back in the United States, Williams passed through customs without incident, but Addison and Butler were stopped and the contents of their wine bottles discovered.

---

[1] The Government's initial version of the offense, not a part of the record on appeal, apparently concluded that Mr. Hollins was responsible for seven kilos of cocaine. In its Corrections to the Presentence Investigation Report, it revised the drug quantity to nearly twelve kilos on the basis of newly acquired lab reports.

At her own state court trial arising out of this trip,
Addison had testified in her own defense: She contended
that she had gone to Jamaica only on vacation and did
not know that the wine bottles she carried contained liquid
cocaine. The statement introduced at Mr. Hollins' sen-
tencing, in which she admitted her involvement and
provided the relevant details, was obtained during a
meeting with customs officials subsequent to her convic-
tion.

The Government also introduced evidence of two
additional trips. The first, apparently taken in early 1995 by
two other women whom Addison had recruited ("the
Addison I trip"), involved a smuggling method similar
to that used in the Reynolds trip. The second apparently
involved Williams, who had traveled alone on a different
occasion and returned with liquid cocaine ("the Williams
trip").

In addition to producing this supplemental drug quantity
evidence, the Government maintained that Mr. Hollins
should receive a four-level enhancement for his role as a
leader or organizer. *See* U.S.S.G. § 3B1.1(a). The presentence
report adopted the Government's version of the offense,
including the drug quantity to be attributed to Mr. Hollins,
and recommended that the district court apply the leader
or organizer enhancement.

In his response, Mr. Hollins offered no direct objections
to the drug quantity calculations. Instead, he contended
that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the
district court could not impose a sentence based on drug
quantities other than those proven to the jury beyond
a reasonable doubt at trial. Because the jury had found
him guilty of the attempt charge on the Reynolds trip
alone, Mr. Hollins believed the 765 grams of cocaine

involved in that incident placed a ceiling on his drug quantity liability at sentencing.

The district court rejected Mr. Hollins' contentions. It found that, based on the evidence adduced at trial and the Government's additions at sentencing, Mr. Hollins' relevant conduct encompassed offenses involving in excess of five kilograms of cocaine. The court also applied a four-level organizer or leader enhancement under U.S.S.G. § 3B1.1(a), and sentenced him to 188 months' imprisonment, the low end of the applicable guidelines range.

Mr. Hollins appealed his sentence to this court. He maintained his challenge, on *Apprendi* grounds, that the district court's fact-finding and resultant imposition of a mandatory guidelines sentence was unconstitutional. Because Mr. Hollins had preserved this objection and because the Government could not demonstrate successfully that the district court's error was harmless, this court vacated the sentence and remanded for re-sentencing consistent with the dictates of *Booker*.

## C. The Second Sentencing Proceeding

On remand, the district court determined correctly that Mr. Hollins was entitled to a complete resentencing procedure and that all challenges remained open to him. Mr. Hollins, therefore, disputed the evidence of drug quantities that had formed the basis of his prior sentence and chose, in this second proceeding, to put the Government to its proof.

In addition to the original documentary submissions, discussed above, and the evidence produced at trial, the Government, at the district court's direction, called Addi-

son to testify at the resentencing hearing. Although Addison apparently had testified at Wilson's sentencing in 2003 in a manner consistent with her statements in the customs interview,[2] she proved to be a difficult witness in this proceeding. She gave contradictory and confused testimony about her role in the conspiracy. She said that she did not recall her testimony at Wilson's sentencing hearing, and she testified that she had never discussed importing cocaine with Mr. Hollins. However, when the Government walked her through her prior testimony, she admitted that she had worked with Mr. Hollins to smuggle cocaine and gave specific details of several trips and described her role in recruiting and importing. On cross-examination, she admitted to lying under oath at her own trial. She stated again that she had not worked as a recruiter for Mr. Hollins and that she was unsure whether she had made the statements recorded in the customs report. Near the conclusion of her muddled testimony, the court itself pressed her about her truthfulness in this proceeding and at Wilson's sentencing. She testified that, although she did not remember details of the prior proceedings, she remembered that she did not lie.

Following her testimony, the district court heard argument from the parties on the issue of drug quantity and the leadership enhancement. The Government contended that Mr. Hollins was responsible for between 5 and 15 kilograms of cocaine. Its calculation was based on: (1) a

---

[2] The transcript of Wilson's sentencing hearing is not a part of the record on appeal in this case. However, the Government examined Addison at length regarding her testimony in that proceeding when she appeared at Mr. Hollins' sentencing hearing.

stipulated amount of 765 grams from the Reynolds trip, of which Mr. Hollins was convicted; (2) a stipulated amount of 1702 grams from the Stewart trip, of which Mr. Hollins was acquitted; (3) 4161 grams from the Addison II trip, based on the forensic amounts of 1387 grams from the bottles of Addison and Butler and attributing an identical amount to Williams who passed through customs undetected; (4) 510 grams from the Addison I trip, the quantity having been determined by the average quantity of the pouches used in the three-person Reynolds trip; and (5) 4161 grams of liquid cocaine from the champagne bottles smuggled during the Clemons trip, based on the forensic evidence of quantity from the Addison II trip, which had used wine bottles.[3] Mr. Hollins objected to the Government's calculation, basing his arguments again on his interpretation of the Supreme Court's holding in *Booker* and the constitutionality of sentencing a defendant based on facts not proven to the jury. He also contended that the evidence was simply insufficient to hold him criminally responsible for certain of the amounts.

The district court ruled that it would consider the 765 grams from the Reynolds trip, 2964 grams from the portions of the Addison II trip that were substantiated by forensic evidence and an identical amount from the Clemons trip. The court specifically ruled that it would not consider the quantities attributed to the acquitted conduct of the Stewart trip, the liquid cocaine that Williams

---

[3] For reasons undisclosed by the record, during oral argument at the second sentencing proceeding, the Government did not ask the court to attribute any drug quantity to Mr. Hollins from the Williams trip, although in the prior proceeding it had contended that the Williams trip involved 693 grams.

had passed through customs without detection on the Addison II trip or any of the amounts the Government claimed from the Addison I trip. *See* R.365-4 at 106-07. The court therefore found that Mr. Hollins was responsible for approximately six and a half kilos of cocaine, resulting in a base offense level of 32.

The parties also argued about Mr. Hollins' role in the offense enhancement. The Government maintained its position that the evidence showed a wide-ranging conspiracy with Mr. Hollins and Wilson at the helm, sufficient to support a four-level leadership enhancement. Mr. Hollins contended that his role was substantially smaller than Wilson's and that, because Wilson had received only a three-level enhancement, Mr. Hollins' enhancement, if any, certainly should be less than three levels. The district court concluded that, "in fairness," Mr. Hollins enhancement should be reduced to match Wilson's. R.365-4 at 111. With a total offense level thus determined to be 35 and a criminal history category of I, the resulting guidelines range was 168 to 210 months. The Government advocated a low-end sentence of 168 months. The court considered the seriousness of the offense and the harm done to the lives of the couriers, many of whom were young women with children. The court, noting that Wilson had received 151 months after pleading guilty, expressed its desire to avoid unwarranted sentencing disparities between the co-defendants. *See* 18 U.S.C. § 3553(a)(6). Accordingly, it imposed a below-guidelines sentence of 151 months' imprisonment for Mr. Hollins as well.

Mr. Hollins once again timely appeals his sentence.

## II

## DISCUSSION

Mr. Hollins raises both factual and legal challenges to his sentence. He contends that the district court's drug quantity and leadership role findings were clearly erroneous. He also poses a variety of constitutional challenges to a sentence based in significant part on matters not presented to the jury.

Post-*Booker*, we generally review a sentence for reasonableness in light of the statutory sentencing factors in 18 U.S.C. § 3553(a). *United States v. Acosta*, 474 F.3d 999, 1001 (7th Cir. 2007). However, we review de novo legal questions, including the correct application of the advisory guidelines, *United States v. Ngatia*, 477 F.3d 496, 501 (7th Cir. 2007), and due process challenges to sentencing, *United States v. Farris*, 448 F.3d 965, 967-68 (7th Cir. 2006), *cert. denied*, 75 U.S.L.W. 3707 (U.S. June 29, 2007) (No. 06-7363). We review findings of fact made by the district court, including the drug quantity and leadership role, for clear error. *Ngatia*, 477 F.3d at 500; *United States v. Melendez*, 467 F.3d 606, 608-09 (7th Cir. 2006), *cert. denied*, 75 U.S.L.W. 3708 (U.S. June 29, 2007) (No. 06-11174); *United States v. Olson*, 450 F.3d 655, 685 (7th Cir. 2006). Clear error will be found when, on review of the entire evidence, we are left with the definite and firm conviction that a mistake has been made. *United States v. Hankton*, 432 F.3d 779, 789 (7th Cir. 2005). These standards apply to all of Mr. Hollins' challenges on appeal; beyond the legal and factual errors he claims guided the district court's calculation, he does not contend that his sentence was otherwise unreasonable.

**A.  Drug Quantities**

In cases involving drug conspiracies, a sentencing court must consider as relevant conduct all "types and quantities of drugs that were part of the same course of conduct or common scheme or plan," whether or not the defendant was "charged with or convicted of" these other acts. *United States v. McEntire*, 153 F.3d 424, 435 (7th Cir. 1998) (internal quotation marks and citations omitted); *see also* U.S.S.G. § 3B1.1(a)(1). We have recognized that, in light of the lower burden of proof demanded of the Government at sentencing, combined with the fact that the Federal Rules of Evidence do not apply in sentencing proceedings, the aggregation rule gives the Government "tremendous leverage in drug cases." *McEntire*, 153 F.3d at 435. A defendant in a drug conspiracy is liable for all quantities of drugs with which he was involved directly and any amounts attributable to his co-conspirators if those amounts were reasonably foreseeable to him. *United States v. Wilson*, 481 F.3d 475, 483 (7th Cir. 2007); *Olson*, 450 F.3d at 685; *United States v. McLee*, 436 F.3d 751, 765 (7th Cir. 2006); *see also* U.S.S.G. § 1B1.3(a)(1) (providing that, "in the case of jointly undertaken criminal activity . . . whether or not charged as a conspiracy" a defendant's base offense level should be calculated on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" in addition to those acts in which he was directly involved).

**1.  The Addison II Trip**

Mr. Hollins claims that the district court erred in holding him criminally responsible for the amounts involved in the Addison II trip. The district court counted only those

drug quantities attributed to Addison and Butler from this trip, both of whom were caught and whose bottles were tested. The only question, therefore, is whether these amounts were part of the scheme and were reasonably foreseeable to Mr. Hollins.

Mr. Hollins submits that the court held him responsible without making the requisite finding that the cocaine involved in the Addison II trip was reasonably foreseeable to him. However, it is plain from the record that the framework of the entire drug quantity inquiry before the court was foreseeability, and, therefore, the court's ultimate conclusion that Mr. Hollins should be charged with the amounts involved in the Addison II trip encompassed a determination that these quantities were foreseeable. *See* R.365-4 at 94 (stating that the parties should address "the question [of] what was foreseeable to [Mr. Hollins] by a preponderance of the evidence, what quantity of cocaine was foreseeable to him which relates to the conspiracy").

Mr. Hollins further claims that, other than certain of Addison's contradictory statements, the evidence does not support a finding that Mr. Hollins had any involvement in this particular transaction. Even if this were the case, Mr. Hollins still could be liable for this amount. The Government's burden in attributing drug quantities to a particular defendant does not require that it show that the defendant is involved in or even have direct knowledge of a particular transaction; "[r]easonable foreseeability refers to the scope of the agreement that [a defendant] entered into when he joined the conspiracy, not merely to the drugs he may have known about." *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993). This question about the scope of Mr. Hollins' agreement is precisely the question that the district court answered when it stated, "[t]he

evidence is clear that Mr. Wilson and Mr. Hollins ran this thing . . . . The jury found that [Mr. Hollins] conspired with Mr. Wilson." R.365-4 at 103. Having credited Addison's statements and testimony to the extent that they establish "that she did have a relationship with Mr. Hollins and also with this drug conspiracy," *id.* at 106, the district court noted that "there is certainly enough evidence" to conclude that the amounts brought in by Addison were "part of this conspiracy," *id.* at 103. These comments indicate that the court was convinced of Mr. Hollins' central role in the conspiracy and of his continuing knowledge of Addison's role in it when the court concluded that Mr. Hollins reasonably foresaw the drug quantities on the Addison II trip. In short, these facts were relevant considerations in assessing the scope of Mr. Hollins' agreement and, therefore, the quantities of cocaine reasonably foreseeable to him in the ongoing conspiracy.

We also conclude that the district court did not err in crediting certain portions of Addison's testimony and discrediting certain others without an explicit statement of reasons made on the record. Mr. Hollins relies on *United States v. Beler*, 20 F.3d 1428 (7th Cir. 1994), in support of his argument that the district court was required to provide such an explanation. In *Beler*, we overturned a sentence in which the primary evidence of drug quantity was a statement by a witness that was at odds with the witness' own earlier quantity estimate. *Id.* at 1433-35. We faulted the district court for its conclusory determination relying on the witness' higher estimate without any reference to the fact that the witness also had stated that the transaction at issue involved a significantly lower amount. *Beler* is inapposite on its facts. Unlike the court in *Beler*, the district court here did not rely on one of two directly

contrary factual statements. It sifted through the testimony of a difficult witness and distilled the barest of facts relating to her involvement in the conspiracy. This kind of evidence sifting is certainly not beyond the competence or authority of a sentencing court. It is at the heart of the district court's function, and we shall not second guess the determinations made by a judicial officer who has observed the testimony and made careful judgments about the witness' veracity.

### 2. The Clemons Trip

With regard to the Clemons trip, Mr. Hollins contends simply that there was insufficient evidence for the district court to conclude that the bottles carried liquid cocaine or that they carried the amount attributed to Mr. Hollins at sentencing (more than 2900 grams).

It is true that the testimony at trial was that the Clemons trip had certain logistical differences from some of the other trips made in furtherance of the conspiracy: Clemons paid his own transportation and apparently did not know before arriving in Jamaica the purpose of his trip. Clemons also did not pay Mark, the Jamaican contact, money sent by Mr. Hollins or Wilson in exchange for cocaine as some other witnesses testified they had. Mr. Hollins claims that these differences demonstrate that the Clemons trip was only a test run for future use of wine bottles that actually would contain liquid cocaine. In this case, he argues, the bottles were filled only with champagne.

Mr. Hollins' characterization may be a plausible account of the Clemons trip, but it is not one required by the record. At trial, Clemons testified that Mark informed him that the bottles did contain cocaine and that Clemons pur-

chased, carried and handed over the bottles to Mr. Hollins believing they contained cocaine. In addition to Clemons' testimony, the district court also had evidence that other individuals caught doing substantially the same thing (albeit with different particulars) *were indeed* found to have been carrying liquid cocaine. That Mr. Hollins presents an alternative view of the evidence does not demonstrate that the district court's finding was clear error. *See United States v. Marty*, 450 F.3d 687, 690-91 (7th Cir. 2006). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

As to the quantity of cocaine the Clemons bottles contained, although evidence of drug quantity must be more than speculative, "nebulous eyeballing," the sentencing guidelines permit *some* amount of reasoned "speculation and reasonable estimation" by a sentencing court. *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998) (citing U.S.S.G. § 2D1.1); *see* U.S.S.G. § 2D1.1, Application Note 12 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, . . . similar transactions in controlled substances by the defendant . . . ."); *Beler*, 20 F.3d at 1433 (noting the necessity of approximation).

In this case, the district court relied on the drug quantities it had attributed to Mr. Hollins from the Addison II trip. This was not baseless speculation or a number drawn "out of thin air," *Jarrett*, 133 F.3d at 530; neither was it based on an impermissible conclusion that the quantity of drugs known to have been used in a particular run was

standard for all runs, *cf. United States v. Johnson*, 185 F.3d 765, 768-69 (7th Cir. 1999) (discussing the problems with applying an average-quantity approach). Instead, the district court looked to the Addison II trip, which was the most closely analogous trip, in which the same specific smuggling method had been used. The court concluded that a per-bottle quantity of liquid cocaine was likely consistent and should be applied to the Clemons bottles as well as to the Addison II bottles. The determination that a per-bottle amount was standard was not baseless, as each of the wine bottles tested in the Addison II trip contained the same amount of liquid cocaine. Moreover, the court's estimate on the Clemons trip was generous to Mr. Hollins based on the facts of the two trips: Although the court believed the wine bottles used in the Addison II trip and the champagne bottles used in the Clemons trip carried the same volume of liquid cocaine, Clemons testified that he carried *six* bottles rather than the four bottles on which the Addison II trip quantity ultimately was calculated. The court nevertheless attributed an identical *total* amount of cocaine—based on the *four* bottle quantity from the Addison II trip—rather than using a per-bottle estimate based on *six* bottles in the Clemons trip. This method of calculation is the kind of reasonable approximation that a district court is directed to under-take under the guidelines.

## B. The Role in the Offense Enhancement

Mr. Hollins also claims that the district court erred in applying an enhancement for acting as a manager or supervisor under U.S.S.G. § 3B1.1(b). At his initial hearing, Mr. Hollins was given a four-point enhancement as a leader or organizer under § 3B1.1(a). The district court

reduced the number at resentencing to create parity with Wilson. Mr. Hollins now objects that the factual finding that he was a manager is clearly erroneous.

In determining whether a role in the offense enhancement is appropriate, sentencing courts should examine the relationship of the defendant to the criminal enterprise. Relevant factors in this inquiry include: "(1) exercise of decision-making authority; (2) participation in committing the offense; (3) recruitment of accomplices; (4) degree of participation in planning or organizing the criminal activity; (5) degree of control or authority exercised over others involved in the criminal activity; and (6) the nature and scope of the illegal activity." *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003); *see also* § 3B1.1, cmt. 4.

The district court made findings on the record that Mr. Hollins, along with Wilson, clearly ran the conspiracy, and the record identified far more than five people involved in the importation of cocaine for Mr. Hollins and Wilson. The court also found that Mr. Hollins was responsible for recruiting multiple couriers and arranging details of their runs. While the couriers came and went, Mr. Hollins remained in a role facilitating numerous trips to import substantial amounts of cocaine. Mr. Hollins' main objection was that he was less responsible, and, therefore, less accountable, than Wilson. Even if that contention is supported by the record, it does not undermine the facts found by the trial court that Mr. Hollins exercised a management role.[4] We have stated that the

---

[4] The Application Notes themselves make clear that more than one individual simultaneously may wield sufficient authority in a criminal enterprise to qualify for a particular role in the

(continued...)

district court must make factual findings on the record that at least five members were in the conspiracy and determine whether he had control over four of them. *See United States v. Zaragoza*, 123 F.3d 472, 482 (7th Cir. 1997).[5] We have further stated, however, that failure to make such findings does not require remand "so long as the enhancement is adequately supported by the record." *Id.* at 483. The record in this case adequately supports the enhancement given.

## C. Constitutional Claims

Finally, Mr. Hollins presents a variety of constitutional challenges to his sentencing, all of which we previously have considered and rejected. Judicial fact-finding by a preponderance of the evidence is still a legitimate basis for arriving at the applicable guidelines range and does not violate the Constitution so long as the guidelines are advisory and the ultimate sentencing decision is based on

---

[4] (...continued)

offense enhancement. U.S.S.G. § 3B1.1, Application Note 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

[5] In light of changes to the Application Notes accompanying § 3B1.1, we have retreated from the language in *United States v. Zaragoza*, 123 F.3d 472, 482 (7th Cir. 1997), which stated that the defendant must have exercised control over at least four participants in order to qualify for a role in the offense enhancement. *United States v. Blaylock*, 413 F.3d 616, 620-21 (7th Cir. 2005); *see also* U.S.S.G. § 3B1.1, cmt.2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*." (emphasis added)).

the § 3553(a) factors. *See, e.g.*, *United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006), *cert. denied*, 75 U.S.L.W. 3354 (U.S. Jan. 8, 2007) (No. 06-8091), ("[N]o constitutional violation resulted from the application of upward adjustments based on facts found by the district court by a preponderance of the evidence. Judges may continue to make findings based on a preponderance of the evidence, provided that they do not treat the Sentencing Guidelines as 'laws' with binding effect." (internal citation and quotation marks omitted)).

Mr. Hollins further contends that, under the *Booker* remedial regime, any sentencing exposure above that which could be imposed on the basis of jury-found facts violates ex post facto principles, and, therefore, due process. We previously have rejected this argument, and we confirm that result in this case. *See, e.g.*, *Farris*, 448 F.3d at 968 (noting that a defendant cannot demand, on the basis of due process, "a sentence that comports with the Sixth Amendment requirements of *Booker*, but . . . avoid[] the possibility of a higher sentence under the remedial holding of *Booker*" (internal quotation marks and citation omitted)); *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005) (same).

## Conclusion

The district court's findings as to drug quantity and leadership role were not clearly erroneous. Mr. Hollins' sentence was calculated properly. We also reject the challenges Mr. Hollins poses to the remedial holding of *Booker*. Accordingly, the judgment of the district court imposing a sentence of 151 months' imprisonment is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
