In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1965

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PIOTR KRASINSKI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 251—**John W. Darrah**, *Judge.*

ARGUED FEBRUARY 25, 2008—DECIDED SEPTEMBER 19, 2008

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Piotr Krasinski raises several challenges to the sentence he received for conspiring to distribute Ecstasy and conspiring to launder monetary instruments. We find none persuasive. First, we reject his challenge to the enhancement he received under U.S.S.G. § 2S1.1(b)(2)(B) because the transfer of money from the United States to Canada to pay for the pills he supplied "promoted the carrying on" of the drug conspir-

acy. Next, the district court did not clearly err when it estimated the number of pills attributable to Krasinski by performing a calculation based on the range he admitted in his plea agreement. In light of Krasinski's admissions that he threatened a cooperating witness and his family, the district court was also justified in imposing an obstruction of justice enhancement and denying an acceptance of responsibility reduction. Finally, Krasinski's sentence at the low end of the advisory guidelines range was reasonable. As a result, we affirm the judgment of the district court.

## I. BACKGROUND

Piotr Krasinski, a Canadian citizen and resident, pled guilty to conspiring to distribute 3,4 methylenedioxy-methamphetamine, commonly known as "MDMA" or "Ecstasy," in violation of 18 U.S.C. §§ 841(a)(1) and 846. He also pled guilty to conspiring to launder monetary instruments in violation of 18 U.S.C. § 1956(a)(2). Krasinski admitted in his plea agreement that from 1999 through March 2003, he agreed with Piotr Misiolek, Andrzej Ogonowski, and others to distribute Ecstasy pills. He further admitted that he generally brokered deals ranging from 5,000 to 30,000 pills per delivery, that he delivered pills to the others on approximately eight to ten occasions, and that on March 5, 2003, he delivered 7,000 pills.

Krasinski typically sold the pills at a cost of $3.50 to $6 per pill knowing that the pills would be resold for at least $8 to $10. Krasinski's co-conspirators sometimes

brought United States currency into Canada to pay him for the pills. At other times, Krasinski received payment in United States currency while in the United States and then brought the money back to Canada with him, and on some occasions, Krasinski's co-conspirators in the United States sent him money in Canada after the pills had been delivered.

After his arrest, Krasinski learned that Ogonowski had provided information to the government concerning Krasinski's involvement in the Ecstasy scheme. Krasinski told another inmate to tell Ogonowski that Krasinski knew people in Poland who would hurt him if he did not help Krasinski, and he provided a false story for Ogonowski to tell. Later, while Krasinski and Ogonowski were transported to court together, he told Ogonowski that if anyone testified against him, that person would have his throat cut. He also made a slashing motion across his throat. The next month, in a conversation recorded by the government, Krasinski suggested he would harm Ogonowski if he did not follow through with Krasinski's false story.

Using the United States Sentencing Guidelines in effect at the time of the sentencing hearing on October 26, 2004, the district court concluded that Krasinski's guidelines range, although he had no criminal history, was 292 to 365 months. The district court imposed a sentence of 292 months' imprisonment. On appeal, in light of the United States Supreme Court's decision its opinion in *United States v. Booker*, 543 U.S. 220 (2005), we vacated and remanded Krasinski's sentence because it was unclear whether the district court had applied the guidelines in a

mandatory or advisory manner. After a new sentencing hearing, the district again imposed a sentence of 292 months' imprisonment. Krasinski appeals and raises multiple challenges to his sentence.

## II.  ANALYSIS

### A.  U.S.S.G. § 2S1.1(b)(2)(B) enhancement

Krasinski maintains he should not have received an enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), which provides for a two-level enhancement in money laundering cases "if the defendant was convicted under 18 U.S.C. § 1956." He did not object to this enhancement before the district court, so our review is for plain error. *See United States v. Wainwright*, 509 F.3d 812, 815 (7th Cir. 2007).

Krasinski pled guilty to conspiring to launder monetary instruments in violation of 18 U.S.C. § 1956(h). That might seem to end matters, as he was "convicted under 18 U.S.C. § 1956," but the government does not argue that it does.[1]

---

[1] Despite the seemingly clear language of U.S.S.G. § 2S1.1(b)(2)(B), a conviction under section 1956 does not always end the inquiry. Application Note 3(C) to the guideline provides that the section 2S1.1(b)(2)(B) enhancement does not apply "if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957." *See also United States v. Tedder*, 403 F.3d 836, 842-44 (7th Cir. 2005) (discussing Application Note 3(C)). The sole object of Krasinski's

(continued...)

Instead, although Krasinski does not challenge his conviction itself in this proceeding, the dispute on appeal concerns whether Krasinski's conduct was enough to support his money laundering conviction. Krasinski maintains that it was not, and, therefore, that the U.S.S.G. § 2S1.1(b)(2)(B) enhancement cannot stand.

The federal money laundering statute, 18 U.S.C. § 1956, contains distinct provisions pertaining to domestic and international activity. The section pertinent here, section 1956(a)(2), has two subsections, and each criminalizes a type of international monetary transfer. Krasinski was charged with violating subsection (a)(2)(A), which prohibits transport, transmittal, or transfer of funds out of the country "with the intent to promote the carrying on of specified unlawful activity"; it does not refer to "proceeds" of the activity. The elements of a conspiracy to violate section 1956(a)(2)(A) are thus that the defendant: (1) conspired; (2) to transport funds between the United States and another country; (3) with the intent to promote the carrying on of specified unlawful activity. *See United States v. Pierce*, 224 F.3d 158, 162 (2d Cir. 2000).

Other provisions in the statute, in contrast, specifically refer to "proceeds." For example, section 1956(a)(2)(B) criminalizes certain international transfers that "represent

---

[1]  (...continued)

conspiracy was not to commit a section 1957 money laundering offense, however, so this exception does not apply.

the proceeds of some form of unlawful activity."[2] The domestic provisions require a showing of "proceeds" as well. *See* 18 U.S.C. §§ 1956(a)(1), (a)(3).

Pointing to our decision in *United States v. Malone*, 484 F.3d 916 (7th Cir. 2007), Krasinski maintains that he did not "promote the carrying on" of any illegal activity. In *Malone*, the defendant made cash deliveries that served as the final step in a drug operation, and a jury convicted him of conspiring to sell the drugs and conspiring to commit money laundering. We considered whether

---

[2] Section 1956(a)(2) begins:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> > (A) with the intent to promote the carrying on of specified unlawful activity; or
> >
> > (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
> > >
> > > (ii) to avoid a transaction reporting requirement under State or Federal law,
>
> shall be sentenced . . . .

merely making these deliveries constituted transactions in the "proceeds" of unlawful activity under the money laundering statute. Concluding they were not, we said that "unlike the act of reinvesting a criminal operation's net income to promote the carrying on of the operation, the act of paying a criminal operation's expenses out of gross income is not punishable as a *transaction in proceeds* under § 1956(a)(1)(A)(i)."[3] *Id.* at 921 (emphasis added); *accord United States v. Santos*, 128 S. Ct. 2020, 2031 (2008) (plurality opinion) ("proceeds" in 18 U.S.C. § 1956(a)(1) means "profits," not "receipts").

*Malone* does not help Krasinski because unlike the provision at issue in *Malone*, the section Krasinski was charged with conspiring to violate (section 1956(a)(2)(A)) contains no "proceeds" requirement. *See United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994) ("... § 1956(a)(2) contains no requirement that 'proceeds' first be generated by unlawful activity, followed by a financial transaction with those proceeds, for criminal liability to attach."). In fact, *Malone* actually hurts Krasinski. We ex-

---

[3] The defendant in *Malone* was charged with violating 18 U.S.C. § 1956(a)(1)(A)(i), which makes it a crime when a person,

> . . . knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

> (A)(i) with the intent to promote the carrying on of specified unlawful activity.

plicitly noted in *Malone* that "the promotion element [of the money laundering statute] can be met by 'transactions that promote the continued prosperity of the underlying offense,' i.e., that at least some activities that are part and parcel of the underlying offense can be considered to promote the carrying on of the unlawful activity." 484 F.3d at 921 (quoting *United States v. Febus*, 218 F.3d 784, 790 (7th Cir. 2000)). The absence of a "proceeds" requirement in section 1956(a)(2)(A) reflects that Congress decided to prohibit any funds transfer out of the country that promotes the carrying on of certain unlawful activity.

The plurality opinion in the Supreme Court's recent decision in *Santos*, 128 S. Ct. 2020, supports our circuit's reading of the "promotion" element. In the course of its discussion of "proceeds" under the money laundering statute, the plurality noted that dissenting opinions in the case posited that one way to address an issue concerning the meaning of "proceeds" would be to interpret narrowly the statute's "promotion" requirement. *Id.* at 2027. The plurality characterized such an argument as follows: "A defendant might be deemed not to 'promote' illegal activity 'by doing those things . . . that are needed merely to keep the business running,'. . ., because promotion (presumably) means doing things that will cause a business to grow. See Webster's 2d, p. 1981 (giving as one of the meanings of 'promote' '[t]o contribute to the growth [or] enlargement' of something)." *Id.* The plurality discounted the argument for a narrow interpretation of the promotion requirement, stating:

> The federal money-laundering statute, however, bars not the bare act of promotion, but engaging in

certain transactions "with the intent to promote *the carrying on* of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i) (emphasis added). In that context the word naturally bears one of its other meanings, such as "[t]o contribute to the . . . prosperity" of something, or to "further" something. See Webster's 2d, p.1981.

*Id.*

In this case, the international transport and transfer of funds contributed to the drug conspiracy's prosperity and furthered it along. Krasinski was one of Misiolek's Ecstasy suppliers in Canada. Krasinski's co-conspirators in the United States brought or sent him money in Canada, and, in return, he supplied them with Ecstasy pills that were sold in the United States. At other times, Krasinski received money in the United States and brought it back with him to Canada to pay for the pills that were eventually resold in the United States as part of the conspiracy. That was enough to satisfy the statute's promotion requirement, *see United States v. Garcia Abrego*, 141 F.3d 142, 163 (5th Cir. 1998), and the district court made no error when it imposed the U.S.S.G. § 2S1.1(b)(2)(B) enhancement.

### B. Drug quantity calculation

Krasinski also challenges the district court's calculations of both the number of pills attributable to him and the weight of those pills, calculations that were used to set Krasinski's base offense level under the guidelines. The

government has the burden of proving the quantity of drugs attributable to a defendant for sentencing purposes by a preponderance of the evidence. *United States v. Soto-Piedra*, 525 F.3d 527, 529 (7th Cir. 2008). We review the district court's factual findings regarding drug quantity for clear error. *Id.* We also note that although Krasinski argues to the contrary, the district court properly used the version of the guidelines in effect at the time of his sentencing, instead of an earlier edition, to calculate his advisory guidelines range. *See, e.g., United States v. Anderson*, 517 F.3d 953, 961 n.1 (7th Cir. 2008); *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006).

Krasinski maintains that the district court erred when it found him responsible for the sale of 112,000 pills. He contends he was only responsible for 30,000 pills and that any amount above that lacks sufficient indicia of reliability. A defendant has a due process right to be sentenced on the basis of reliable information, *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008), and a district court may not base its drug quantity calculation on pure speculation or "nebulous eyeballing," *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998). A seizure of the drugs involved in the offense, of course, provides reliable information regarding drug quantity. *See Bautista*, 532 F.3d at 672. Admissions in a plea agreement also conclusively establish the admitted facts. *United States v. Warneke*, 310 F.3d 542, 550 (7th Cir. 2002) ("An admission is even better than a jury's finding beyond a reasonable doubt; it removes all contest from the case.").

A district court may use a reasonable estimate of the quantity of drugs attributable to a defendant for guide-

lines purposes. *United States v. Acosta*, 534 F.3d 574, 582 (7th Cir. 2008); *see also* U.S.S.G. § 2D1.1 cmt. n.12 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."). Here, Krasinski admitted in his plea agreement that he delivered between 5,000 and 30,000 Ecstasy pills on approximately eight to ten separate occasions. He also admitted delivering 7,000 pills on March 5, 2003. With these statements in mind, the district court first found that Krasinski delivered Ecstasy pills on seven occasions, a conservative figure in light of Krasinski's admission that he made eight to ten deliveries. The district court then took note of Krasinski's specific admission that he delivered 7,000 pills on one occasion. For the other six deliveries, the district court estimated that he delivered 17,500 pills each time, a figure he calculated by averaging the 5,000- and 30,000-pill figures. The result was a total of 112,000 pills.

As we have recognized before, arriving at sentencing determinations through averaging can be problematic. *See United States v. Johnson*, 185 F.3d 765, 768-69 (7th Cir. 1999). "[A]t some point a court's estimation will seem less like a restrained approximation and more like unsupported conjecture." *United States v. Henderson*, 58 F.3d 1145, 1152 (7th Cir. 1995). A calculation based on a wide range of endpoints, for example, is cause for concern. *Compare United States v. Sepulveda*, 15 F.3d 1161, 1197 (1st Cir. 1993) (using midpoint between four ounces and one kilogram to determine drug quantity erroneous) *with United States v. Webster*, 54 F.3d 1, 5-6 (1st Cir. 1995) (upholding use

of two ounces for circumstances where witness testified that one to three ounces supplied and eight ounces in instances where witness stated six to twelve ounces supplied). Extrapolating from a small number of known quantities also raises a red flag, especially when the maximum and minimum amounts are unknown. *See Johnson*, 185 F.3d at 769 (vacating sentence where amount carried on fourth trip determined only by looking to amount carried on three others); *United States v. Shonubi*, 998 F.2d 84, 89-90 (2d Cir. 1993) (finding error in assumption that quantity of heroin possessed on one trip represented typical quantity on eight trips).

The calculation employed by the district court in this case was not the most conservative one it could have performed. The district court could have held Krasinski responsible for a one-time delivery of 7,000 pills, one delivery of 30,000 pills, and six deliveries of 5,000 pills, a calculation also consistent with the plea agreement. *See Jarrett*, 133 F.3d at 530-31 (approving conservative drug quantity approximation based on five months of undercover purchases and defendant's admissions). The result would have been a total of 67,000 pills, and, notably, a lower offense level for Krasinski. *See* Presentence Report at 6 (deeming Krasinski responsible for 80,000 to 240,000 Ecstasy pills).

Nonetheless, we cannot say that the district court's decision to hold Krasinski responsible for 112,000 pills was clearly erroneous. The district court based the number of deliveries and the range for the quantity of pills in those deliveries on numbers supplied by Krasinski himself.

Significantly, unlike in *Johnson*, we know the maximum and minimum quantities involved. *Cf. Johnson*, 185 F.3d at 765. Moreover, Krasinski states in his sentencing memorandum that according to Misiolek, Ogonowski said Krasinski was responsible for about 100,000 pills, so a second source supported the decision to hold Krasinski responsible for between 80,000 and 240,000 pills, the range of pills in Krasinski's advisory guidelines range. And although Krasinski claims that Ogonowski would testify that Krasinski supplied only 30,000 pills, Krasinski cites nothing in support of his claim, and Krasinski admitted to supplying more than that in his own plea.

Krasinski also takes issue with the district court's use of the typical weight table in U.S.S.G. § 2D.1.1, Application Note 11, to estimate that each Ecstasy pill weighed 250 milligrams. The guidelines provide that "[u]nless otherwise specified, the weight of a controlled substance . . . refers to the *entire weight* of any mixture or substance containing a detectable amount of the controlled substance." *Id.* (emphasis added). The guidelines do not list Ecstasy or MDMA as substances for which actual drug weight should be used. *See* U.S.S.G. § 2D1.1(c)(B). As a result, as we have recognized before, a defendant who sells Ecstasy pills "is responsible for the weight of the whole pill, not just the active ingredient." *United States v. Roche*, 415 F.3d 614, 619 (7th Cir. 2005).

Krasinski emphasizes that the typical weight table should not be used "if any more reliable estimate of the total weight is available from case-specific information." U.S.S.G. § 2D1.1, cmt. n.11; *see also United States v. Gaines*,

7 F.3d 101, 102-03 (7th Cir. 1993). In this case, he maintains, a more reliable estimate of the total weight exists—that of the 9,000 pills the government confiscated. Krasinski asserts that these pills weighed a total of 342 grams, or 38 milligrams per pill. The lab reports in the record, however, indicate that the seized pills weighed an average of 323 milligrams per pill. Krasinski's figures appear to be based on the weight of the active ingredient in the pills instead of the correct measure, the weight of the entire pill. Not only was the district court's decision to use the typical weight table proper, then, but it also benefitted Krasinski. The "typical" weight of an Ecstasy pill according to the guidelines (250 milligrams) is lower than the average weight of the recovered pills. Accordingly, the district court's drug quantity calculations were not clearly erroneous.

## C. Obstruction of justice and acceptance of responsibility

Krasinski also maintains that the district court should not have imposed an obstruction of justice enhancement and that it should have granted a reduction for acceptance of responsibility. We review de novo whether the district court made appropriate findings to support the obstruction enhancement, and we examine any underlying factual determinations for clear error. *United States v. Johnson*, 497 F.3d 723, 725 (7th Cir. 2007). Whether a defendant accepted responsibility is a factual determination that we also review for clear error. *United States v. Samuels*, 521 F.3d 804, 817 (7th Cir. 2008).

The guidelines call for a two-point obstruction of justice enhancement when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Examples include "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. n.4(a).

Krasinski argues that the district court should not have relied on a translation of a recorded February 26, 2004 conversation between Krasinski and another inmate (not Ogonowski), as he contends the translation is inaccurate. But the district court did not rely on the February 26, 2004 conversation when it imposed the enhancement. Instead, it pointed to the conduct Krasinski admitted in the plea agreement and found that those admissions warranted the enhancement. Krasinski admitted in his plea agreement and confirmed during his change of plea hearing that he attempted to persuade Ogonowski to change his testimony. He further admitted that he threatened to have others harm Ogonowski if he testified against Krasinski, including a specific threat that anyone testifying against him would have his throat cut in Poland. These admissions were more than sufficient to support the obstruction of justice enhancement.

The guidelines also provide for a two-level reduction, at the district court's discretion, if the defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "When a sentencing court properly

enhances a defendant's offense level under § 3C1.1 for obstructing justice, 'he is presumed not to have accepted responsibility.'" *United States v. Ewing*, 129 F.3d 430, 435 (7th Cir. 1997) (quoting *United States v. Larsen*, 909 F.2d 1047, 1050 (7th Cir. 1990)); *see also* U.S.S.G. § 3E1.1 n.4 ("Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply."). The district court recognized that it could find Krasinski accepted responsibility even after it imposed an obstruction of justice enhancement, and we do not find its decision not to do so clearly erroneous. Krasinski's threats against Ogonowski were serious. And even though they took place before he pled guilty, a defendant is not entitled to an acceptance of responsibility reduction merely for pleading guilty. *See United States v. Jones*, 52 F.3d 697, 701 (7th Cir. 1995). Krasinski pled guilty only after his attempts to obstruct justice failed, and the district court was justified in concluding that his case was not an extraordinary one.

**D. Reasonableness**

Finally, Krasinski maintains that his 292-month sentence is unreasonable. We presume that a sentence within the properly calculated guidelines range is reasonable, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005), and Krasinski's sentence is at the low end of this range. In arriving at the sentence it did, the district court acknowl-

edged Krasinski's character letters and lack of criminal history. In light of the scale of the scheme and Krasinski's threats against a witness, however, the district court decided that the 292-month sentence was appropriate to meet the goals expressed in 18 U.S.C. § 3553. That decision was not unreasonable.

### III.  CONCLUSION

The judgment of the district court is AFFIRMED.